OPINION OF THE COURT
Smith, J.
The question presented by this appeal concerns the construction of State and Federal statutory provisions relating to Medicaid and the reasonableness of the method utilized by the Monroe County Department of Social Services (DSS) to determine the eligibility for Medicaid of an institutionalized spouse. Specifically at issue is the decision to utilize the “income first” method rather than the “resource first” method to determine eligibility for Medicaid. Because we conclude that the statutes are ambiguous and do not resolve the issue presented; that the income first method is premised upon a reasonable interpretation of the relevant statutory provisions and is consistent with the underlying policy of the Medicaid statute, there should be a reversal.
*659 I.
Medicaid is a medical assistance program established by title XIX of the Social Security Act (42 USC § 1396 et seq.), implemented in New York by article 5, title 11 of the Social Services Law, and jointly funded by this State and the Federal Government. The program’s purpose is to pay for necessary medical care for those eligible individuals whose income and resources do not allow them to meet the costs of their medical needs. New York’s Medicaid plan, like those of all States, must conform with the Federal statutory standards in order for the State to receive Federal program funding. The Medicaid program is administered by the United States Department of Health and Human Services under the auspices of the Health Care Financing Administration and, locally, by the New York State Department of Social Services.[1]
In 1988, Congress enacted the Medicare Catastrophic Coverage Act (MCCA) (42 USC § 1396r-5, as added by Pub L 100-360, 102 US Stat 754) to address a perceived flaw in the Medicaid program which compelled a couple to liquidate virtually all of their joint resources before an institutionalized spouse could become eligible for Medicaid. In doing so, the non-institutionalized spouse, referred to as the community spouse, was left with little or no income to meet his or her daily needs (see, Matter of Schachner v Perales, 85 NY2d 316, 319). The MCCA sought “ ‘to end th[e] pauperization [of the community spouse] by assuring that [he or she] has a sufficient — but not excessive — amount of income and resources’ ” to live comfortably when the other spouse was institutionalized (see, id., at 323 [quoting HR Rep No. 100-105 (II), 100th Cong, 2d Sess 65]). At the State level, Social Services Law § 366-c implements this goal and serves also “to protect the community spouse from financial disaster when the primary income-providing spouse becomes institutionalized” (see, Matter of Schachner v Perales, supra, at 323).
Consequently, the Act requires that the community spouse be allotted a minimum level of monthly income referred to as the “minimum monthly maintenance needs allowance” or “monthly need” (see, 42 USC § 1396r-5 [d] [3]; Social Services Law § 366-c [2] [h]). The community spouse is also granted a “community spouse resource allowance” to protect him or her *660 from being forced to spend down owned assets to qualify the institutionalized spouse for Medicaid (see, 42 USC § 1396r-5 [f] [2]; Social Services Law § 366-c [2] [d]). Only resources of the couple in excess of the community spouse resource allowance are taken into account in determining the institutionalized spouse’s eligibility (42 USC § 1396r-5 [c] [2]).[2] The statute also allows transfers from the institutionalized spouse to the community spouse to raise the community spouse’s income up to the level of the minimum monthly maintenance needs allowance (Social Security Act [42 USC] § 1396r-5 [d] [1] [B]; Social Services Law § 366-c [4] [b]). If either spouse is dissatisfied with the community spouse resource allowance determination, he or she may request a “fair hearing” (42 USC § 1396r-5 [e]; Social Services Law § 366-c [8] [a]).
In the instant case, petitioner’s husband, Floyd Golf, was admitted to a nursing home in January 1993. After his death in August 1993, Mrs. Golf petitioned the Monroe County Department of Social Services for Medicaid benefits for payment of nursing home expenses incurred by her husband for two of the months he resided at the nursing home. Applying the aforementioned statutory rules, the agency established that the couple had combined resources of $105,763.60. Of that amount, $86,855.25 was attributed by the agency to Mrs. Golf and $18,908.35 was attributed by the agency to her husband. Mrs. Golf, as the community spouse, was entitled to retain a community spouse resource allowance of $70,740 and required a minimum monthly maintenance needs allowance of $1,769. However, she actually received a monthly income of only $1,379.06. The local agency determined that Mr. Golf had actual excess resources, after standard deductions, totaling $13,100 and had a monthly income of $1,319.58. Given these calculations, it was evident that Mrs. Golfs actual monthly income was less than her established monthly need (minimum monthly maintenance needs allowance) of $1,769.
Because of this shortfall between Mrs. Golfs actual income and her monthly need, the agency determined that Mr. Golf could transfer income and resources to his wife in order to raise her income to the monthly need level. Monroe County DSS first deducted $389.94 from Mr. Golfs income and transferred that amount to Mrs. Golf, and in so doing, raised *661 her monthly income to the required monthly need level of $1,769. After doing so, however, the local agency deemed Mr. Golf ineligible for Medicaid for the two months for which he sought coverage because he had $13,100 in excess resources. It denied Mrs. Golfs petition for Medicaid assistance.
At the fair hearing to review the local agency’s determination, Mrs. Golf argued that the agency’s decision to utilize the income first method — i.e., its decision to first transfer some of Mr. Golfs (the institutionalized spouse) income to her (the community spouse) to meet a shortfall in her monthly income need and then to determine his eligibility — was error. Instead, she asserts, the agency should have utilized the resource first method. Specifically, if applying the resource first method, the agency first should have allocated all or a portion of her husband’s excess resources (the $13,100) to her and allowed her to retain any income generated by those excess resources in an effort to increase her monthly income to the appropriate level. Petitioner further asserted that if a community spouse’s resource level is increased by the inclusion of all of the institutionalized spouse’s excess resources and the community spouse’s income level remains below the minimum monthly maintenance needs allowance then, posteligibility, the community spouse is to be allocated a sufficient amount of the institutionalized spouse’s income. This, argues Mrs. Golf, is what should have occurred in her case.[3]
Thus, the crux of petitioner’s argument — and the fundamental distinction between the two methods — is that once a shortfall in Mrs. Golfs monthly need was evident, the agency should have transferred to Mrs. Golf all of her husband’s excess resources as a way of raising her income to close the shortfall. Next, the agency should have examined Mr. Golfs eligibility status. Because he would then be resourceless, he should have been deemed eligible for Medicaid assistance. Finally, after being deemed eligible, the agency could have, and should have, transferred a portion of Mr. Golfs income to Mrs. Golf to close the shortfall in her monthly need. However, in this case, the *662 Monroe County DSS left untouched Mr. Golfs resources and instead first transferred a portion of his income to his wife to meet the shortfall in her monthly need. Once this transfer was complete, and Mrs. Golfs monthly need was met, the agency next examined Mr. Golfs eligibility for Medicaid. It deemed him ineligible because of the excess amount of resources— totaling $13,100 — in his possession.
Petitioner’s arguments were rejected by the New York State Department of Social Services and the agency’s application of the income first method was sustained on the ground that the pertinent laws and regulations did not require a contrary result. Petitioner then commenced this CPLR article 78 proceeding seeking to annul the State’s determination. Supreme Court denied the application, holding that the State’s determination was not arbitrary and capricious since the statutes in question did not definitively require the utilization of either the “resource first” or “income first” method. The Appellate Division unanimously reversed. It held that the State DSS erred in not employing a “resource first” method in determining eligibility. On remittal, Supreme Court awarded judgment to the petitioner. Respondents sought leave to appeal directly from this Supreme Court judgment and leave was granted by this Court.
II.
In this case, we are called upon to construe a Federal statutory provision and its functionally identical State corollary. Petitioner asserts that the pertinent statutory provisions are clear, explicit, and unambiguous and, if read logically and sequentially, mandate that the resource first method be applied. Indeed, according to petitioner, no other rational or reasonable interpretation may be distilled from the statutes.
We disagree. While petitioner has asserted one credible interpretation of the State and Federal statutes, it cannot be said that the legislative scheme plainly and unequivocally requires the application of only the “resource first” rule. While at least one other jurisdiction has held otherwise (see, e.g., Gruber v Ohio Dept. of Human Servs., 98 Ohio App 3d 72, 647 NE2d 861 [1994], appeal denied 71 Ohio St 3d 1493, 646 NE2d 468; Kimnach v Ohio Dept. of Human Servs., 96 Ohio App 3d 640, 645 NE2d 825 [1994], appeal denied sub nom. In re Kimnach, 71 Ohio St 3d 1447, 644 NE2d 409), in fact the Federal and State statutes lend themselves to two acceptable interpretations. Thus, we conclude that the language and *663 purpose of the statutes permit the application of an “income first” method.
The reasonableness of the agency’s decision to attribute income rather than resources to the community spouse from the institutionalized spouse and to do so prior to determining the eligibility of the institutionalized spouse is evident. First, it cannot be said that the spousal impoverishment provisions are clear and unambiguous on the issue presented. In fact, the statute is entirely silent on whether the “income first” or “resource first” method should be utilized. The relevant statutory provision provides that:
“If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse’s income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance” (42 USC § 1396r-5 [e] [2] [C]; see also, Social Services Law § 366-c [8] [c]; 18 NYCRR 360-4.10 [c] [7]).
Petitioner argues that the “community spouse’s income” referenced in this section is limited to the community spouse’s personal income as outlined by the rules for the treatment of income in subsection (b) (2)[4] and cannot include income available to the community spouse — such as the “community spouse *664 monthly income allowance” — through subsection (d) (l).[5] The community spouse monthly income allowance is simply the amount by which the community spouse’s monthly need exceeds the monthly income available to him or her.
However, the language of the Federal statute is not so restricted. Indeed, petitioner’s construction is undermined by the simple fact that the attribution-of-income rules outlined in subsection (b) (2) do not reference or, by their own terms, apply to the allocation of resources, which is the subject of subsection (e) (2) (C). As the Federal District Court in Cleary v Waldman (959 F Supp 222) reasoned:
“In light of the detailed provisions of subsection (d) designed to make available to the community spouse as much, but only as much, of the institutionalized spouse’s income as necessary to ensure her monthly need, it would be anomalous to construe subsection (e) (2) (C) in such a manner as to exclude the institutionalized spouse’s income from the calculation and substitute for it resources which would provide the needed income to ensure that the community spouse received her monthly needs allowance” (id., at 232).
Nor does petitioner point to any compelling evidence that Congress intended the attribution of income from the institutionalized spouse to the community spouse to be made only after eligibility had been determined. Subsections (b) and (d) of *665 the Act do not “prescribe a sequential restriction on income attribution” (Thomas v Commissioner of Div. of Med. Assistance, 425 Mass 738, 746, 682 NE2d 874, 879 [1997]). We concur with the view that:
“[w]hile it is true that subsections (b) (2) and (d) apply ‘after’ eligibility has been determined, this does not mean that income can be deemed to the community spouse ‘only’ after eligibility has been determined. * * * Rather, subsections (b) (2) and (d) can be interpreted as a framework for protecting income for the community spouse by limiting the amount of the institutionalized spouse’s income which must be used to pay medical costs after the latter is determined eligible” (425 Mass, at 746-747, 682 NE2d, at 879).
There is simply no evidence stemming from the statutory language or legislative history which definitively demonstrates that the statute prohibits the attribution of income to the community spouse for eligibility purposes. Absent such an express or implied limitation, an agency’s decision to attribute income to the community spouse under subsection (e) (2) (C) was not arbitrary or capricious (see, Thomas v Commissioner of Div. of Med. Assistance, supra, 425 Mass, at 746-747, 682 NE2d, at 879-880; see also, Cleary v Waldman, supra, at 232).
Second, the policy objectives underlying the spousal impoverishment provisions are met by an application of the income first method. As previously stated, the MCCA was enacted to ensure that the community spouse was provided with an income above the poverty level (see, Matter of Schachner v Perales, 85 NY2d 316, 323, supra [“Manifestly, the narrow purpose of the legislation providing for the spousal allowance is to protect the community spouse from financial disaster”]). It was not intended to offer a financial boon for applicants or to provide a route upon which one could bypass the obligation to contribute one’s fair share of the costs associated with nursing home care. An agency’s transfer of income, rather than resources, to the community spouse effectively serves the dual goals of ensuring that the community spouse would live comfortably and of protecting against the depletion of limited Medicaid resources by individuals capable of helping themselves (see, Cleary v Waldman, supra, at 232 [the income first model prevents the creation of “an endowment which not only provides the needed income but also creates a fund which can be passed on to the community spouse’s heirs”]).
*666 In so holding, we also reject petitioner’s policy argument that application of the income first method would not offer a community spouse the protection intended by the legislation. More specifically, Mrs. Golf maintains that if the institutionalized spouse predeceases the community spouse (as happened here), the income which the community spouse was receiving from the institutionalized spouse could very well terminate, thereby leaving the community spouse with less income than the minimum monthly maintenance needs allowance which he or she was receiving prior to the death of the institutionalized spouse. Petitioner’s argument is speculative. It is equally true that the community spouse may die first; or if the institutionalized spouse dies first, his or her income may become available to the community spouse, thereby actually increasing the aggregate income of the community spouse.
More significantly, as respondent agency correctly asserted, the Medicaid statute in question serves to prevent the impoverishment of the community spouse “while the institutionalized spouse is in a nursing home at Medicaid expense” (Matter of Schachner v Perales, supra, at 323 [citation omitted]). Once the institutionalized spouse dies and his or her Medicaid eligibility terminates, that spouse is no longer within the purview of the Medicaid statute. Given the limited scope of the spousal impoverishment amendments, and the Medicaid statute’s silence with respect to the question whether or how States should account for the risk that the institutionalized spouse might predecease the community spouse, it would be inappropriate to hinge the validity of the income first method on such a worst-case scenario.[6]
Finally, we note that the Health Care Financing Administration (HCFA), the Federal agency responsible for administering the Medicaid statute, has issued a policy statement asserting that “States have the option to use the ‘income first’ rule or to apply some other reasonable interpretation of the law until we have issued final regulations which specifically address this issue” (Letter from Sally K. Richardson, Director, Medicaid Bureau, Health Care Financing Administration, to All Regional Administrators [Mar. 3, 1994]). We have previously stated that where an agency’s determination “is not only consistent with *667 the governing statutes and regulations but also comports with the conclusion reached by [HCFA] — the Federal agency charged with interpreting Medicaid requirements” (Cricchio v Pennisi, 90 NY2d 296, 309) that determination is entitled to deference. Such is the case here. Moreover, given the fundamental ambiguity of the relevant statutory provisions, deference is appropriately given to the State agency’s interpretation in this case (see, Paramount Communications v Gibraltar Cas. Co., 90 NY2d 507, 513-514; see also, Matter of Jennings v New York State Off. of Mental Health, 90 NY2d 227, 239-240).
III.
We conclude that the dissent’s reliance on certain language in Social Services Law § 366-c (8) (c) or on the virtually identical regulation promulgated at 18 NYCRR 360-4.10 (c) (7), as evidence supporting the proposition that the resource first method is mandated, is misplaced. We note again that both the State Social Services Law and the regulation are, essentially, the State statutory and regulatory counterparts to 42 USC § 1396r-5 (e) (2) (C) — the very Federal statutory provision we construe here. As stated in the notice published when the regulation was promulgated, “Chapter 558 of the Laws of 1989 [Social Services Law § 366-c] conformed the SSL to the Medicaid requirements of the Federal Medicare Catastrophic Coverage Act of 1988 (P.L. 100-360) relating to transfers of resources and to the treatment of income and resources of institutionalized persons and their spouses in the community. The proposed regulatory amendments are necessary to implement Chapter 558” (New York State Register, Oct. 17, 1990, at 39). Thus, the language of the regulation, and the State statute, present and frame the same issue we address herein; neither the language of the Social Services Law nor the regulation clearly resolves the issue presented.
As the dissent concedes (dissenting opn, at 675-676), the language of the Federal statute and regulations is ambiguous and does not dictate whether the institutionalized spouse’s income or resources should be transferred first in meeting the community spouse’s minimum income needs. The dissent, however, relies on a difference between the language of 42 USC § 1396r-5 (e) (2) (C) and Social Services Law § 366-c (8) (c) and argues that the difference renders the State statute clear where the Federal is ambiguous. These provisions provide as follows:
“If either such spouse establishes that the com *668 munity spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse’s income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance” (42 USC § 1396r-5 [e] [2] [C] [emphasis added]).
“If either spouse establishes that income generated by the community spouse resource allowance, established by the social services district, is inadequate to raise the community spouse’s income to the minimum monthly maintenance needs allowance, the department shall establish a resource allowance for the spousal share of the institutionalized spouse adequate to provide such minimum monthly maintenance needs allowance” (Social Services Law § 366-c [8] [c] [emphasis added]; see also, 18 NYCRR 360-4.10 [c] [7] [clearly contemplating a transfer of resources under this provision]).
Although the dissent finds the above-emphasized language to be dispositive, it does nothing more than show that these provisions address only a transfer of resources. This does not alter the ultimate conclusion that this provision does not dictate the resource first methodology.
Concededly, this provision, under both Federal and State statutory frameworks, is clearly designed to permit the transfer of resources at the preeligibility stage. But, demonstrably, neither provision dictates whether income allocation should or should not precede resource allocation. The word “amount” in the Federal statute is not the source of the ambiguity here. Instead, as we previously pointed out (see, majority opn, at 663-664), the ambiguity lies in the language of the critical test, which is identical in both statutes, namely whether the income generated by the resource allowance “ ‘is inadequate to raise the community spouse’s income to the minimum monthly maintenance needs allowance’” (id., at 663 [emphasis supplied]).
This ambiguity, not the ambiguity of the word “amount,” is the fulcrum of the court’s decision in Cleary v Waldman (959 F Supp 222, supra), where it states:
“At issue is what may be included in ‘the com *669 munity spouse’s income’ within the meaning of subsection (e) (2) (C). The State contends that the statute permits it to consider any income which the husband can transfer to the wife to meet her needs before allowing the husband to transfer additional resources under subsection (e) (2) (C). The plaintiffs contend that only her personal income may be considered for subsection (e) (2) (C) purposes, and that the statute mandates a transfer of resources from the husband in an amount sufficient to generate income to make up any shortfall” (id., at 228 [emphasis added]; see also, Thomas v Commissioner of Div. of Med. Assistance, supra, 425 Mass, at 747, 682 NE2d, at 879-880).
As the above-emphasized language clearly indicates, the ambiguity identified in the Federal statute and relied upon to support the administrative determination to allocate income to the community spouse before doing a resource allocation is not in the meaning of “amount,” as the dissent claims, but is in the meaning of “community spouse’s income.” Since the latter phrase is used in exactly the same way in the State statute as it is in the Federal, the same reasoning supports the State agency’s determination to allocate income first.
Thus, what is unclear is not the fact that 42 § USC 1396r-5 (e) (2) (C) and Social Services Law § 366-c (8) (c) speak to the transfer of resources at the preeligibility stage, but whether that transfer takes place before or after the creation of the community spouse monthly income allowance (CSMIA). It is undisputed that the statutes contemplate the transfer of income between spouses at some point (see, 42 USC § 1396r-5 [d] [defining the CSMIA as an amount to be transferred from the institutionalized spouse to the community spouse to bring the community spouse’s income up to the minimum monthly maintenance needs allowance]; Social Services Law § 366-c [2] [g] [same]). Critical to an affirmance, however, is the fact that neither the Federal nor State statute provides for when such a transfer takes place — preeligibility (and preresource transfer) or posteligibility — and therein lies the room for agency interpretation.
The dissent’s reliance on Social Services Law § 366-c (3) and (4) for the proposition that the State statute only permits income transfers between spouses in the posteligibility stage is unpersuasive (see, dissenting opn, at 679, 680-681). Section 366-c (3) states that its provisions are to be employed for *670 purposes of “determining the availability of income to an institutionalized spouse in determining eligibility for medical assistance” (emphasis supplied). Thus, by its own express terms, the purpose of section 366-c (3) is to address issues of income eligibility of the institutionalized spouse. Income eligibility is not at issue here where the case exclusively turns on the resource eligibility of the institutionalized spouse. Furthermore, section 366-c (3) is totally unrelated to establishing or calculating the CSMIA, which is critical to deciding whether the State agency properly determined resource eligibility of the institutionalized spouse here. Rather, all it seems to accomplish is to ensure that when determining the institutionalized spouse’s income for eligibility purposes, there is no attribution from the community spouse’s income.
Section 366-c (4) — the other section relied upon by the dissent as demonstrating that income allocation occurs posteligibility — also has little to do with that issue. Again, by its own terms, the purpose of the subdivision is to decide how much of the institutionalized spouse’s income will be used for that spouse’s medical care once eligibility has been determined. It does not address when a transfer of spousal income is made to meet the minimum monthly maintenance needs allowance of the community spouse. Indeed, if anything, it suggests an earlier transfer of such income in that it specifically provides that the CSMIA comes out of the institutionalized spouse’s income before any of that income goes to the health facility.
The dissent also cites to Social Services Law § 366-c (8) (b). It appears that this citation is meant to reinforce the proposition that no income transfers from the institutionalized spouse to the community spouse are permitted prior to the determination of eligibility (see, dissenting opn, at 679). However, section 366-c (8) (b) of the Social Services Law outlines the requirements for obtaining an increase in the monthly need level; it does not speak to raising a community spouse’s income to the existing monthly need level, the issue presented here. Were we even to assume that section 366-c (8) (b) has some relevance to the specific issue on appeal, clearly, this provision of the statute does not provide the “only” means to effectuate an income transfer from the institutionalized spouse to the community spouse (see, Social Services Law § 366-c [2] [g] [statute permitting interspousal income transfer has no cross-reference to section 366-c (8) (b)]).
Finally, it is important to note that it is not surprising that the statutes specifically provide for preeligibility resource *671 transfers, but are silent as to the stage when income transfers are to be made. With regard to the former, the Legislature had to specifically provide for resource transfers at the preeligibility stage to prevent the exhaustion of such resources prior to any necessary transfers.[7] Income, however, will not be exhausted in the same manner because it is recurrent in nature. Indeed, income allocations, even when made prior to the initial eligibility determination, must continue to be made periodically thereafter.
IV.
In sum, because the relevant statutory provisions are ambiguous, we sustain the decision of Monroe County DSS to utilize an income first method to determine petitioner’s eligibility for Medicaid. We, too, share the dissent’s concern for the frustrations experienced by this State’s senior citizens and its social service administrators as they maneuver through a maze of complex and ill-defined laws. But, in holding that the statutes do not mandate the transfer of resources first, we are mindful that the policy of the law is to prevent impoverishment of the community spouse; it is not to permit the sheltering of personal wealth at public expense. To the extent that the income first method preserves the public fisc, clearly such a result inures to the benefit of all New York senior citizens in that additional resources are more readily available to meet the needs of eligible applicants. Application of the resource first rule, in circumstances involving a spouse with no personal income, would permit the transfer of several hundred thousand dollars over and above the standard resource allowance, enabling the institutionalized spouse to qualify more readily for Medicaid. Even in a case such as the one before us, the community spouse’s need for a few hundred dollars in monthly income would have allowed (assuming a 5 or 6% return) the transfer of more than $100,000 from the institutionalized *672 spouse. Such a result might well be desirable. However, this policy choice and mandate should come unambiguously from the Legislature. Indeed, in Massachusetts, that State’s lawmaking body amended its statute to make clear its intention and its preference for the resource first method. It cannot be said that the New York Legislature has done the same, and thus the State agency acted properly in utilizing the income first method.
Accordingly, the judgment of Supreme Court appealed from and the order of the Appellate Division brought up for review should be reversed, without costs, and the petition dismissed.

. Effective October 1, 1996, the obligation to administer the Medicaid program in New York State was transferred to the Department of Health (see, L 1996, ch 474, §§ 233-248).

. 42 USC § 1396r-5 (c) (5) excludes certain assets from the definition of “resources.” Items excluded are the marital home, household goods, personal belongings, the value of a burial space, and a reasonable amount of the value of an automobile and funds for burial expenses (see, 42 USC § 1382b).

. Here, it was recognized that even if all of Mr. Golfs excess resources totaling $13,100 — had been transferred to Mrs. Golf, those resources still would not have generated sufficient additional income to meet Mrs. Golfs monthly need. At that point, argues Mrs. Golf, since Mr. Golf would no longer be “over-resourced” by virtue of having transferred his excess resources to his wife, the agency should have deemed Mr. Golf eligible for medical assistance. After having established his eligibility, the agency then should have allocated to Mrs. Golf additional income sufficient to raise her income up to the minimum monthly maintenance needs allowance.

. 42 USC § 1396r-5 (b), provides, in relevant part:
“(1) Separate treatment of income
“During any month in which an institutionalized spouse is in the institution, except as provided in paragraph (2), no income of the community spouse shall be deemed available to the institutionalized spouse.
“(2) Attribution of income
“In determining the income of an institutionalized spouse or community spouse for purposes of the post-eligibility income determination described in subsection (d) of this section, except as otherwise provided in this section and regardless of any State laws relating to community property or the division of marital property, the following rules apply”.
It provides that with respect to nontrust property, payment of income solely in the name of one spouse is considered available only to that one spouse. Payment in both spouses’ names is divided equally. As a general rule, for posteligibility purposes, each spouse is deemed entitled to his or her own income (see also, Social Services Law § 366-c [3] [a] - [f] [delineating the presumptions to apply in determining the availability of income]).

. 42 USC § 1396r-5 (d), entitled, “Protecting income for community spouse” provides:
“(1) Allowances to be offset from income of institutionalized spouse
“After an institutionalized spouse is determined or redetermined to be eligible for medical assistance, in determining the amount of the spouse’s income that is to be applied monthly to payment for the costs of care in the institution, there shall be deducted from the spouse’s monthly income the following amounts in the following order:
“(A) A personal needs allowance * * *
“(B) A community spouse monthly income allowance”.
“(2) Community spouse monthly income allowance defined
“In this section (except as provided in paragraph (5)), the ‘community spouse monthly income allowance’ for a community spouse is an amount by which—
“(A) except as provided in subsection (e) of this section, the minimum monthly maintenance needs allowance (established under and in accordance with paragraph (3)) for the spouse, exceeds
“(B) the amount of monthly income otherwise available to the community spouse (determined without regard to such an allowance).” (See also, Social Services Law § 366-c [4], [2] [g].)

. One option available to a community spouse faced with such an exigency is that he or she may raise this issue at a hearing and request adjustments to the standard resource and income allowance (see, 42 USC § 1396r-5 [e] [2] [A]-[C]). This issue can be addressed on a case-by-case basis via the hearing mechanism.

. The dissent points to various statutory provisions which the State may utilize in order to recoup any monies inappropriately or disproportionately sheltered by the Medicaid applicant or his or her spouse (see, dissenting opn, at 674). First, it is not clear that the State would have any recourse against a community spouse who, during her lifetime, transfers to her children resources received from the institutionalized spouse under a resource first methodology. Second, the practical difficulties of recoupment should not be lightly dismissed. We reiterate that while the spousal impoverishment provisions serve to support those in medical need, they are not vehicles for enriching the family of an applicant. That some means of recoupment exist is no reason to create opportunities for sheltering assets.