[872 NE2d 236, 840 NYS2d 550]

In the Matter of the Estate of MARGARET M. TOMECK, Deceased. EDWARD M. TOMECK, as Executor of MARGARET M. TOMECK, Deceased, Respondent-Appellant; ROBERT CHRISTOPHER, as Commissioner of Social Services of Saratoga County, Appellant-Respondent, et al., Respondent.

Argued May 31, 2007; decided June 28, 2007

**POINTS OF COUNSEL**

*Mark M. Rider, County Attorney*, Ballston Spa (*Hugh G. Burke* of counsel), for appellant-respondent. I. The Appellate Division erred in failing to find a case of fraud by the community spouse. (*Commissioner of Dept. of Social Servs. of City of N.Y. v Spellman*, 243 AD2d 45; *Matter of Klink*, 278 AD2d 883; *Calvanese v Calvanese*, 93 NY2d 111; *Commissioner of Dept. of Social Servs. of City of N.Y. v Fishman*, 280 AD2d 396; *Vanderbilt Credit Corp. v Chase Manhattan Bank*, 100 AD2d 544; *State of New York v Coyle*, 171 AD2d 288; *Case v Fargnoli*, 182 Misc 2d 996.) II. The estate is in violation of section 273 of the Debtor and Creditor Law. (*Spanierman Gallery, PSP v Love*, 320 F Supp 2d 108; *Pfohl Bros. Landfill Site Steering Comm. v Allied Waste Sys., Inc.*, 255 F Supp 2d 134; *United States v McCombs*, 30 F3d 310; *Miner v Edwards*, 221 AD2d 934; *United States v Alfano*, 34 F Supp 2d 827; *Matter of Gafco, Inc. v H.D.S. Merchantile Corp.*, 47 Misc 2d 661; *United States v Hansel*, 999 F Supp 694.) III. The estate is in violation of section 7-3.1 of the Estates, Powers and Trusts Law. (*Case v Fargnoli*, 182 Misc 2d 996; *Vanderbilt Credit Corp. v Chase Manhattan Bank*, 100 AD2d 544.) IV. The Appellate Division's reliance upon *Robbins v DeBuono* (218 F3d 197 [2000]) is unfounded. (*Wisconsin Dept. of Health & Family Servs. v Blumer*, 534 US 473; *Matter of Golf v New York State Dept. of Social Servs.*, 91 NY2d 656; *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler*, 537 US 371; *Ruck v Novello*, 295 F Supp 2d 258; *Binder & Binder PC v Barnhart*, 399 F3d 128; *Bianconi v Preston*, 383 F Supp 2d 276; *Rose v Rose*, 481 US 619; *Schweiker v Gray Panthers*, 453 US 34; *Weinberger v Wiesenfeld*, 420 US 636; *Califano v Boles*, 443 US 282.) V. If *Robbins v DeBuono* (218 F3d 197 [2000]) is to be applied, the actions of the State do not violate its holding. VI. The Surrogate erred in ruling that it had no jurisdiction

over the Margaret M. Tomeck Irrevocable Trust. (*Matter of Peck,* 79 Misc 2d 1053; *Matter of Van Patten,* 190 AD2d 322.)

*Pierro & Associates, LLC,* Albany (*Louis W. Pierro* of counsel), for respondent-appellant. I. The Appellate Division erred in affirming the Surrogate's Court's order denying the estate's request for attorney's fees pursuant to 42 USC §§ 1983 and 1988. (*Matter of Johnson v Blum,* 58 NY2d 454; *Matter of Northeast Cent. School Dist. v Sobol,* 79 NY2d 598; *Matter of Craig,* 82 NY2d 388; *Matter of Buhaina,* 187 Misc 2d 312; *Matter of Thomasel v Perales,* 78 NY2d 561; *Morenz v Wilson-Coker,* 321 F Supp 2d 398, 415 F3d 230; *Matter of Martinez v Perales,* 135 AD2d 818.) II. The Appellate Division correctly affirmed the Surrogate's Court's holding that the automatic allocation of John Tomeck's Social Security benefits to his wife, Margaret M. Tomeck, violated the anti-alienation provisions of the Social Security Act. (*Matter of Schachner v Perales,* 85 NY2d 316; *Wisconsin Dept. of Health & Family Servs. v Blumer,* 534 US 473; *Matter of Golf v New York State Dept. of Social Servs.,* 91 NY2d 656; *Robbins v DeBuono,* 218 F3d 197; *Matter of Craig,* 82 NY2d 388; *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler,* 537 US 371; *A.R. v New York City Dept. of Educ.,* 407 F3d 65; *Ruck v Novello,* 295 F Supp 2d 258; *Binder & Binder PC v Barnhart,* 399 F3d 128; *Bianconi v Preston,* 383 F Supp 2d 276.) III. The Department of Social Service's arguments regarding fraud, violations of the Debtor and Creditor Law and the Estates, Powers and Trusts Law, and jurisdiction over the irrevocable trust are barred from review as they were not part of its motion for leave to appeal. (*Quain v Buzzetta Constr. Corp.,* 69 NY2d 376.) IV. Assuming arguendo that the Department of Social Services is not barred from raising the fraud and state law violation arguments, the Appellate Division properly affirmed the Surrogate's Court's holding that Margaret Tomeck did not commit fraud or violate Debtor and Creditor Law § 273 and EPTL 7-3.1. (*Matter of Craig,* 82 NY2d 388; *Bourgeois v Stadtler,* 256 AD2d 1095; *Matter of John XX.,* 226 AD2d 79; *Matter of Shah v DeBuono,* 95 NY2d 148; *Morenz v Wilson-Coker,* 321 F Supp 2d 398; *Spanierman Gallery, PSP v Love,* 320 F Supp 2d 108; *Pfohl Bros. Landfill Site Steering Comm. v Allied Waste Sys., Inc.,* 255 F Supp 2d 134; *Case v Fargnoli,* 182 Misc 2d 996; *Matter of Spetz v New York State Dept. of Health,* 190 Misc 2d 297; *Vanderbilt Credit Corp. v Chase Manhattan Bank,* 100 AD2d 544.) V. Assuming arguendo that the Department of Social Services is not barred from raising the issue of jurisdiction ruled on by the courts below, the

Surrogate's Court correctly held that it did not have jurisdiction over the Margaret M. Tomeck Irrevocable Trust. (*Matter of Van Patten,* 190 AD2d 322; *Matter of Peck,* 79 Misc 2d 1053.)

*Andrew M. Cuomo, Attorney General,* Albany (*Caitlin J. Halligan, Daniel Smirlock* and *Victor Paladino* of counsel), amicus curiae. I. *Robbins v DeBuono* (218 F3d 197 [2000]) which is not binding on this Court, is no longer good law in light of the intervening decision of the Supreme Court in *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler* (537 US 371 [2003]). (*People v Kin Kan,* 78 NY2d 54; *Flanagan v Prudential-Bache Sec.,* 67 NY2d 500, 479 US 931; *Binder & Binder PC v Barnhart,* 399 F3d 128; *Ruck v Novello,* 295 F Supp 2d 258; *Bianconi v Preston,* 383 F Supp 2d 276.) II. *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler* (537 US 371 [2003]) requires dismissal of the estate's defense under 42 USC § 407 (a). (*Bianconi v Preston,* 383 F Supp 2d 276; *Robbins v DeBuono,* 218 F3d 197; *Rose v Rose,* 481 US 619; *Weinberger v Wiesenfeld,* 420 US 636; *Califano v Boles,* 443 US 282; *Fetterusso v State of New York,* 898 F2d 322; *Schweiker v Gray Panthers,* 453 US 34.)

**OPINION OF THE COURT**

READ, J.

The Commissioner of the Saratoga County Department of Social Services (the County DSS) seeks to recoup Medicaid payments made on behalf of John M. Tomeck (the husband) from the estate of Margaret M. Tomeck (the wife) and a trust that she created. To resolve this appeal, we must consider the spousal impoverishment provisions of the Medicaid Act (42 USC § 1396r-5) and its state counterpart (Social Services Law § 366-c), the income-first policy adopted by New York to carry out these provisions (Social Services Law § 366-c [8] [c]), and the anti-alienation provision of the Social Security Act (42 USC § 407 [a]). In particular, we are called upon to decide whether New York's income-first policy, which takes Social Security benefits into account, violates the federal anti-alienation provision. We hold that it does not.

I.

Medicaid's Spousal Impoverishment Provisions

Medicaid, a joint federal-state program established pursuant to title XIX of the Social Security Act (42 USC § 1396 *et seq.*),

pays for medical care for those unable to afford it, including nursing home care for medically needy older people who become eligible by incurring medical expenses that reduce their monthly income and assets below prescribed levels. Ordinarily, a local Medicaid agency employee calculates an applicant's income and resources to figure out how much must be reduced or "spent down" in order for the applicant to meet the financial criteria to qualify for Medicaid benefits (*see* 42 USC § 1396r-5 [c] [1] [B]; Social Services Law § 366-c [7]; 18 NYCRR 360-4.8 [c]).

"Because spouses typically possess assets and income jointly and bear financial responsibility for each other, Medicaid eligibility determinations for married applicants have resisted simple solutions" (*Wisconsin Dept. of Health & Family Servs. v Blumer*, 534 US 473, 479 [2002]). Thus, as part of the Medicare Catastrophic Coverage Act of 1988 (MCCA) (42 USC § 1396r-5), Congress adopted the spousal impoverishment provisions, a complex set of standards governing the allocation of resources between the spouse residing in a nursing home (the institutionalized spouse) and the spouse residing in the community (the community spouse). In general, these provisions are designed to insure that the community spouse retains necessary, but not excessive, income and assets, which do not need to be depleted to make the institutionalized spouse eligible for Medicaid. "In the MCCA, Congress sought to protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance" (*Blumer*, 534 US at 480; *see also Matter of Schachner v Perales*, 85 NY2d 316, 319 [1995] [discussing prior law]).

The spousal impoverishment provisions include rules for assigning income to spouses, and for determining the community spouse's "minimum monthly maintenance needs allowance" (MMMNA), an amount deemed sufficient for the community spouse to live at a modest level after the institutionalized spouse becomes eligible for Medicaid, subject to a statutory floor and ceiling (*see* 42 USC § 1396r-5 [b], [d] [3]; Social Services Law § 366-c [2] [h], [j]; [3]). Any shortfall between the MMMNA and the income allotted to the community spouse is denominated the "community spouse monthly income allowance" (CSMIA), which is one of the allowances or amounts "deducted" when determining the institutionalized spouse's monthly income available to pay for nursing home care (*see* 42 USC § 1396r-5 [d] [1], [2]; Social Services Law § 366-c [2] [g]; [4]).

"The provision for [the CSMIA] ensures that income

transferred from the institutionalized spouse to the community spouse to meet the latter's basic needs is not also considered available for the former's care. As a result, Medicaid [pays] a greater portion of the institutionalized spouse's medical expenses than it would absent the CSMIA provision" (*Blumer*, 534 US at 482).

The spousal impoverishment provisions also encompass rules for computing and apportioning a married couple's combined jointly and separately owned resources in order to protect the community spouse's share, called the "community spouse resource allowance" (CSRA) (*see* 42 USC § 1396r-5 [f] [2]; Social Services Law § 366-c [2] [d]). The CSRA is generally equal to one half of the couple's total countable (i.e., nonexempt) resources, subject to a statutory floor and ceiling (*see* 42 USC § 1396r-5 [c] [1], [5]; [f] [2]; Social Services Law § 366-c [2] [c], [d], [e]; *see also Blumer*, 534 US at 482 n 5). All of the institutionalized spouse's countable resources and the community spouse's countable resources exceeding the CSRA may be used to pay for nursing home care, and must be spent down in order for the institutionalized spouse to qualify for Medicaid (*see* 42 USC § 1396r-5 [c] [2]; Social Services Law § 366-c [5] [a]). Once Medicaid eligibility is established, however, "no resources of the community spouse shall be deemed available" to support the institutionalized spouse (*see* 42 USC § 1396r-5 [c] [4]; Social Services Law § 366-c [5] [c]).

Either spouse has the right to a fair hearing to challenge the adequacy of the MMMNA or the CSRA calculated by the state Medicaid agency (*see* 42 USC § 1396r-5 [e]; Social Services Law § 366-c [8]). A hearing examiner may raise the MMMNA when exceptional circumstances exist, and may increase the CSRA to generate additional income as necessary to meet the MMMNA (*see* 42 USC § 1396r-5 [e] [2] [B], [C]; Social Services Law § 366-c [8] [b], [c]).

Finally, Medicaid benefits may not be withheld from the institutionalized spouse in the event the community spouse declines to make spousal resources available to pay for medical expenses (*see* 42 USC § 1396r-5 [c] [3]; Social Services Law § 366 [3] [a]; *see also* § 366-c [5] [b]). Specifically, section 366 (3) (a) of the Social Services Law mandates that Medicaid

"shall be furnished to applicants in cases where, although such applicant has a responsible relative

with sufficient income and resources to provide medical assistance as determined by the regulations of the department, the income and resources of the responsible relative are not available to such applicant because of . . . the refusal or failure of such relative to provide the necessary care and assistance. In such cases, however, the furnishing of such assistance shall create an implied contract with such relative, and the cost thereof may be recovered from such relative in accordance with title six of article three ['Powers to Enforce Support'] and other applicable provisions of law."

As we have explained, this " 'spousal refusal' rule indicates that Medicaid must be provided to the institutionalized spouse who meets eligibility requirements even if the community spouse has income or resources in excess of the [CSRA], as long as the State may seek recovery of the cost of medical assistance from the community spouse" (*Matter of Shah v DeBuono*, 95 NY2d 148, 161 [2000], citing 42 USC § 1396r-5 [c] [3] and Social Services Law § 366 [3] [a]; *see also* 18 NYCRR 360-4.10 [c] [4]; *Morenz v Wilson-Coker*, 415 F3d 230 [2d Cir 2005] [institutionalized spouse who executed valid assignment of spousal support rights to state could not be deemed ineligible for Medicaid on account of community spouse's assets]).

### New York's Income-First Policy

As previously noted, state and federal law require the CSRA to be increased if either spouse establishes at a fair hearing that it does not generate sufficient earnings to lift the community spouse's monthly income above the MMMNA (*see* 42 USC § 1396r-5 [e] [2] [C]; Social Services Law § 366-c [8] [c]). New York allows the CSRA to increase, however, only after taking the institutionalized spouse's monthly income into account. This approach—called the income-first method—deems or attributes income from the institutionalized spouse to the community spouse. Thus, the CSRA goes up only if the community spouse's monthly income, including any sums that the institutionalized spouse is allowed to provide, still falls short of the MMMNA.

The Deficit Reduction Act of 2005 mandates the income-first method (*see* Pub L 109-171 § 6013, 120 US Stat 4, 64 [codified at 42 USC § 1396r-5 (d) (6)]). Prior to its enactment, though, some states had followed a resource-first policy whereby the

community spouse was permitted to retain excess resources to produce additional monthly income before any of the institutionalized spouse's income was applied for this purpose. This resource-first approach allowed a couple to retain assets that otherwise would have to have been expended in order for the institutionalized spouse to qualify for Medicaid. In *Matter of Golf v New York State Dept. of Social Servs.* (91 NY2d 656 [1998]), the petitioners challenged the local social services agency's use of the income-first rather than the resource-first method to ascertain Medicaid eligibility. We upheld the agency's policy, concluding that the state and federal statutes were ambiguous, and that the income-first method was "premised upon a reasonable interpretation of the relevant statutory provisions and [was] consistent with the underlying policy of the Medicaid statute" (*id.* at 658). Four years later in *Blumer*, the United States Supreme Court held that the State of Wisconsin's application of the income-first method did not conflict with the MCCA's spousal impoverishment provisions.

### Social Security's Anti-Alienation Provision

The anti-alienation provision of the Social Security Act prohibits the assignment or transfer of rights to payment of Social Security benefits, and protects monies paid to recipients from "execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law" (42 USC § 407 [a]). The purpose of this restriction is "to protect social security beneficiaries and their dependents from the claims of creditors" (*Fetterusso v State of New York*, 898 F2d 322, 327 [2d Cir 1990]).

### II.

On July 29, 1996, the wife set up the Margaret M. Tomeck Irrevocable Trust, funded with $20,000, and on August 26, 1996, the husband transferred his undivided half interest in the marital home to the wife. The trust agreement provided that the wife would receive the income from the trust for life; she retained no right to invade the principal for herself, and the trust was irrevocable. In the event the trust held residential property "used" by the wife, she had "the right to occupy the . . . property . . . for residential purposes." If she "cease[d] to use such property as a residence (permanently or seasonally)," the trustees were authorized to hold the property as an investment or sell it. Upon the wife's death, the trust's remainder was to be paid to her living children, per capita.

On December 10, 1996, the husband filed an application with the County DSS for Medicaid benefits. Applying the spousal impoverishment provisions, the agency concluded that the husband and wife had excess resources and income, and denied the husband's application by notice dated January 27, 1997. The husband, who was hospitalized in April 1997, asked for a reassessment. On April 30, 1997, the County DSS again denied the husband's application on the ground of excess resources in the amount of $45,560.91, and excess monthly income in the amount of $287.92.

Meanwhile, the husband had also requested a fair hearing from the New York State Department of Health (DOH). He argued that his wife's CSRA should be increased to allow her to keep the excess assets, which would then generate additional interest income. Since the wife's income still would not reach the MMMNA, however, the County DSS could then attribute a portion of his income to her. DOH rejected this resource-first approach, deciding on July 1, 1997 that the County DSS's "determination regarding the amount the [husband] must contribute to his wife as a [CSMIA] and the amount of excess resources was correct."[1]

In July 1997, another application was filed on behalf of the husband along with a spousal refusal. The wife attested that she needed all of her income and the couple's assets (all of which had been transferred to her) to support herself in the community, and refused to contribute to the husband's care. By virtue of this spousal refusal, the husband became eligible for Medicaid as of July 1, 1997.

The Medicaid worksheet compiled by the County DSS in conjunction with this last application[2] shows combined countable resources or assets totaling $120,354.34 as of July 1997, the month that the husband entered a nursing home. While one half of this amount is $60,177.77, the minimum CSRA for 1997 was $74,820. The balance of $42,084.34[3] was considered excess resources. In short, absent the spousal refusal, the wife would

---

1.  At some point, the husband commenced a CPLR article 78 proceeding to challenge DOH's use of the income-first method. After we handed down our decision in *Golf*, he apparently discontinued this proceeding.

2.  The parties do not dispute the accuracy of any of the figures on the worksheet.

3.  The County DSS arrived at this number by first subtracting the CSRA of $74,820 from $120,354.34, the couple's total countable resources. This yielded $45,534.34, from which the agency then subtracted $3,450, the amount

have been required to spend down $42,084.34 in order for the husband to qualify for Medicaid.

The worksheet also shows that the wife's net monthly income was $1,072.24, consisting of Social Security benefits ($456.80), her pension ($119.62) and interest payments on the CSRA ($539.62[4]) minus a health insurance premium ($43.80); and that the husband's net monthly income was $1,121.75, consisting of his pension ($218.75) and Social Security benefits ($946.80) minus a health insurance premium ($43.80). The MMMNA for 1997 was $1,976, producing a CSMIA of $903.76. Applying the income-first method, the County DSS attributed $903.76 of the husband's income—all of his pension and most of his Social Security benefits—to the wife. The husband's remaining income, or $167.99, was excess income available to pay for his medical expenses.

On June 13, 2001, after the husband had been receiving Medicaid for four years, the wife transferred the marital home to the trust. By a deed dated July 19, 2001, the trustees conveyed the home to a third party for a purchase price of $179,000, and the wife moved elsewhere.

The wife died on August 29, 2002 while the husband was still a patient at the nursing home. On January 12, 2004, the wife's executor filed a petition and formal accounting to settle the estate, and served a citation on the County DSS, apparently because of its potential claim against the husband's elective share.[5]

The agency filed a claim and objections to the accounting, asserting that the wife owed $309,449.03 for Medicaid benefits provided to the husband from 1997 through January 2004. The County DSS took the position that the wife was a responsible relative with sufficient resources to pay for the husband's care. As a result, when he was provided with medical services under

of money that the institutionalized spouse was allowed to retain as a reserve in order to meet any potential needs without jeopardizing his Medicaid eligibility.

4. The wife's actual interest income on all assets was $659.55.

5. On March 8, 2004, the husband's guardian ad litem filed a report with the Surrogate in which he agreed with the estate's attorneys that the husband's elective share of the estate was $30,581.21, and that his elective share of the trust was $61,442.40. In his report dated November 8, 2004, the guardian remarked that it "appear[ed] from the estate['s] papers" to be "conceded" that the County DSS was "entitled to the elective share," or $92,023.61 altogether. The husband died in 2005 during the pendency of this litigation.

the Medicaid program, an implied contract was created with the wife (*see Matter of Craig*, 82 NY2d 388, 391-392 [1993] ["When medical assistance is furnished to an applicant who has a responsible relative with sufficient income and resources to provide medical assistance, the furnishing of such assistance shall create an implied contract with such relative"]; Social Services Law § 366 [3] [a]).

On June 25, 2004, the County DSS moved for summary judgment, demanding that the estate pay over $280,742.99, which it characterized as "the full value of [the wife's] net testamentary and non-testamentary estate." The executor cross-moved for summary judgment seeking dismissal of the claim, approval of the accounting, a determination that the court did not have jurisdiction over the trust, and attorneys' fees under 42 USC § 1988.

The Surrogate denied the agency's motion, dismissed its claim against the estate and its objections to the accounting, granted summary judgment to the executor, and denied the executor's request for attorneys' fees. The Surrogate held that attribution of the husband's Social Security benefits to the wife violated the anti-alienation provision. Since the wife's income was "well below" the MMMNA absent the attribution, the Surrogate concluded that she would have been entitled to an increased CSRA, and did not, in fact, possess excess resources. Concomitantly, the Surrogate concluded that the wife's spousal refusal did not create an implied contract for the husband's care because it was based on the County DSS's "incorrect determination" that the husband's monthly Social Security income could be deemed or attributed to the wife to boost her income to reach the MMMNA.

Next, the Surrogate held that the wife's transfer of the marital home to the trust in 2001 did not affect the husband's Medicaid eligibility and, in any event, he did not have jurisdiction over the trust in an accounting proceeding for the estate. Finally, the Surrogate denied the executor's request for attorneys' fees without explanation. Both parties appealed.

The Appellate Division affirmed, concluding that "no implied contract arose because it was improper for [the County] DSS, in 1997, to allocate Social Security income from the husband to [the wife] to raise her income level to the [MMMNA]" in light of the anti-alienation provision (29 AD3d 156, 159 [3d Dept 2006]). The Appellate Division agreed with the Surrogate that

the wife's transfer of the marital home to the trust had no impact on the husband's Medicaid eligibility. Further,

> "because recovery for medical assistance from the estate . . . [could] only be had on proof that such spouse, at the time of the furnishing of the medical assistance [to the husband], was a financially responsible relative in that . . . she had sufficient income and resources to provide medical assistance, and in light of our holding that no implied contract arose at the time [the wife] executed the spousal refusal or at any point thereafter, we find that respondent has not established a cognizable claim against [the wife's] estate" (*id.* at 162 [internal quotation marks and citation omitted]).

Because no implied contract existed and the County DSS had no cognizable claim, the Appellate Division also rejected the agency's argument that the transfer of the marital home to the trust violated Debtor and Creditor Law § 273 and EPTL 7-3.1 "inasmuch as both of those provisions are designed to protect creditors from conveyances which would otherwise shield the assets from their reach"; similarly, the conclusion that the County DSS had "not asserted a valid claim against [the] estate obviate[d] any need to address" whether the Surrogate had jurisdiction over the trust's assets (*id.*). Finally, the Court decided that the executor was not entitled to attorneys' fees because "[a]lthough requiring an interpretation of the state and federal statutes governing Medicaid benefits, . . . [the] action [did] not equate with a claim asserted under 42 USC § 1983, rendering counsel fees under 42 USC § 1988 unavailable" (*id.* at 163). We subsequently granted the County DSS's motion for permission to appeal, and the estate's motion for permission to cross-appeal.

## III.

The County DSS contends that the wife was a responsible relative with sufficient resources who refused to pay for the husband's nursing home care, which resulted in an implied contract giving the agency the right to assert a claim against the estate to recover Medicaid payments made on the husband's behalf. The key consideration is whether the wife possessed "sufficient means during the period the medical assistance was rendered. If . . . a responsible relative is available who had sufficient means at the time of accrual, the recovery [can] be obtained" (*Craig*, 82 NY2d at 393 [interpreting Social Services

Law § 366 (3) (a)]). If the County DSS properly applied the income-first method when it deemed the husband's monthly Social Security income available to meet the MMMNA, the wife possessed excess resources in July 1997. Thus, we must decide whether this practice subjects Social Security benefits to "execution, levy, attachment, garnishment, or other legal process" in contravention of 42 USC § 407 (a), the anti-alienation provision.

In deciding that the anti-alienation provision was violated here, both lower courts relied on the decision of the United States Court of Appeals for the Second Circuit in *Robbins v De-Buono* (218 F3d 197 [2d Cir 2000]). In *Robbins*, as is the case here, the local social services agency determined that the community spouse had assets in excess of the CSRA. Some months after accepting the institutionalized spouse's Medicaid application, however, the local social services agency "demanded that [the community spouse] contribute to the cost of [the institutionalized spouse's] care from these 'excess' assets and threatened to sue her to recover the money it had spent for [the institutionalized spouse's] care if she refused" (218 F3d at 198). The community spouse did not request a fair hearing to seek to increase her CSRA because she was aware of New York's income-first policy. Instead, she sued in federal court, claiming that the income-first method, to the extent it attributed her spouse's Social Security benefits to her, ran afoul of the anti-alienation provision.

The Second Circuit agreed for two reasons. First, the Court focused on its decision in a case involving a representative payee, *Johnson v Harder* (383 F Supp 174 [D Conn 1974], *cert denied* 423 US 876 [1975]), "[t]he seminal case in [the] circuit on deeming or attributing Social Security benefits" (*Robbins*, 218 F3d at 201). In *Johnson*, the Court concluded that although Social Security benefits were to "be used for the beneficiary's needs, *as he or his representative payee may best determine*" (*id.*), the Connecticut policy at issue, in fact, forced the representative payee to exercise discretion in favor of herself. The Second Circuit reasoned that attribution similarly coerced the community spouse in *Robbins* into spending the institutionalized spouse's Social Security benefits on herself, stripping away her ability to use them as she might "best determine." That is, if the community spouse elected to pay these benefits for the institutionalized spouse's current care, she jeopardized her own well-being since the local social services agency might sue her to

obtain the assets she would need for her own support in the future. Second, the *Robbins* court concluded that the local social services agency's "express threat" to sue to recover the Social Security benefits and its use of the income-first policy in a fair hearing fell within "legal process" as defined by the anti-alienation provision (*id.* at 202).

The United States Supreme Court in *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler* (537 US 371 [2003]), however, subsequently emphasized its "restrictive" interpretation of "other legal process" as that term is used in the anti-alienation provision (537 US at 383-384, 386). The Court's approach in *Keffeler* contrasts sharply with the Second Circuit's admittedly "expansive" interpretation of "legal process" in *Robbins* (218 F3d at 201 ["legal process . . . embrace(s) not only the use of formal legal machinery but also resort to express or implied threats and sanctions" (internal quotation marks and citation omitted)]).

Washington State, which was the representative payee for certain foster care children who were receiving Social Security benefits, used these benefits to offset the cost of foster care by depositing them in a state account. In *Keffeler*, Washington's high court held that section 407 (a) was intended to prohibit creditors from accessing Social Security benefits, and that the state's scheme involved "creditor-type" acts (537 US at 380).

The Supreme Court disagreed, concluding that the key question under section 407 (a)—which the Court tellingly referred to as the Social Security Act's "antiattachment" provision—was not whether Washington was a creditor, but whether the state's "manner of gaining control of the federal funds involve[d] 'other legal process' " (537 US at 383). In deciding that it did not, the Court noted "[t]hat restriction to the statutory usage of 'other legal process' is important here, for in the abstract the department does use legal process as the avenue to reimbursement: . . . by a state legal process the department makes claims against the accounts kept by the state treasurer" (537 US at 383-384); however, section 407 (a)

> "uses the term 'other legal process' far more restrictively . . . . '[O]ther legal process' should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though

not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability" (537 US at 384-385).

Moreover, *Keffeler* distinguished *Philpott v Essex County Welfare Bd.* (409 US 413 [1973]), on which the Second Circuit had relied in *Robbins*, and noted that *Philpott* "involved judicial actions in which a State sought to attach a beneficiary's Social Security benefits as reimbursement for the costs of the beneficiary's care and maintenance" (*Keffeler*, 537 US at 388).

The Second Circuit has subsequently recognized that *Keffeler* "subtly disturbed the law of this Circuit" (*Binder & Binder PC v Barnhart*, 399 F3d 128, 134 [2d Cir 2005]). Several lower courts have gone further. In *Wojchowski v Novello* (2006 WL 1888589, *3, 2006 US Dist LEXIS 46108, *8 [WD NY 2006], *appeal pending* [2d Cir Docket No. 06-3373-CV]), the United States District Court for the Western District of New York held that *Keffeler* undercut "the rationale upon which *Robbins* was based," and accordingly declined to follow *Robbins* (*see also Ruck v Novello*, 295 F Supp 2d 258, 263 [WD NY 2003] [*Keffeler* "seriously undermines the *Robbins* rationale"]; *Bianconi v Preston*, 383 F Supp 2d 276, 278 n [D Mass 2005] [declining to follow *Robbins* and citing *Binder* as support for proposition that *Keffeler* "throws a shadow over *Robbins*"]). The federal district courts in *Wojchowski, Ruck* and *Bianconi* all concluded that attributing or deeming the institutionalized spouse's monthly Social Security income to the community spouse does not violate the anti-alienation provision. We agree.

Attribution does not vest the local social services agency with control over the institutionalized spouse's Social Security benefits. As the district court observed in *Ruck*, the fair hearing does "not directly involve control over property passing from one person to another to discharge some liability" as required under *Keffeler* (*Ruck*, 295 F Supp 2d at 264; *see also Wojchowski*, 2006 WL 1888589 at *3, 2006 US Dist LEXIS 46108 at *9 [attribution does not actually take or wrest control over the institutionalized spouse's benefits]). Although the hearing examiner may approve of the attribution during a fair hearing, he cannot force the institutionalized spouse to hand over a Social Security check to the community spouse.

Second, attribution does not involve a judicial or quasi-judicial process (*see Bianconi*, 383 F Supp 2d at 278 [attribution "does

not create any type of administrative or judicial mechanism bearing any resemblance to 'execution, levy, attachment or garnishment' "]). It is essentially a budgeting methodology. The local social services agency prepares a worksheet on which it calculates the income of the institutionalized spouse and the community spouse, and computes and apportions their resources according to standards set out in the federal and state spousal impoverishment provisions (42 USC § 1396r-5; Social Services Law § 366-c; 18 NYCRR 360-4.10). The worksheet informs the community spouse how much to spend down in order for the institutionalized spouse to qualify for Medicaid. There is no court involved. Moreover, although the claim against the estate in this case is clearly "legal process," the County DSS did not seek the husband's Social Security benefits in this proceeding.

Finally, *Keffeler* requires more than coercion or the threat of litigation to meet the "other legal process" standard. It calls for actual judicial or quasi-judicial process, and thus contradicts *Robbins* to the extent that case indicates otherwise. In any event, there was no "express threat" of litigation here as occurred in *Robbins*. In fact, after the wife declined to spend down in compliance with the spousal impoverishment provisions, the County DSS did not even hint at much less commence a spousal recovery action, and the husband was never forced to do anything in particular with his Social Security benefits.

While married couples are faced with a difficult decision when choosing whether to spend down or pursue a spousal refusal, they do have a choice. The MCCA safeguards the community spouse from impoverishment; it does not guarantee that the community spouse can keep all the couple's assets or maximize the community spouse's wealth, or prevent the government from seeking to recoup Medicaid benefits when a spouse chooses to retain assets rather than spend down (*see* Wone, *Don't Want to Pay for Your Institutionalized Spouse? The Role of Spousal Refusal and Medicaid in Funding Long-Term Care*, 14 Elder LJ 485, 515 [2006] [discussing spousal recovery and estate recovery and noting that "(u)nlike spousal recovery, the community spouse is protected from estate recovery until after his or her death"]).

In sum, because the federal anti-alienation provision did not foreclose the County DSS from attributing the husband's Social Security benefits to the wife, she had sufficient means to pay for the husband's nursing home care as a matter of law in July 1997 when the husband became eligible for Medicaid. Since the

wife possessed sufficient resources at that time, an implied contract for the husband's care was created under Social Services Law § 366 (3) (a). We do not reach any of the other issues raised by the County DSS, which the Surrogate should review in light of our decision. The Appellate Division must, however, first decide whether the Surrogate has jurisdiction over the trust, an issue that it did not reach in light of its disposition of the appeal. We deny the estate's cross appeal requesting attorneys' fees.

Accordingly, the order of the Appellate Division should be modified, without costs, by denying the estate's motion for summary judgment in its entirety, granting the Commissioner's motion for summary judgment as to liability and remitting to the Appellate Division for further proceedings in accordance with this opinion; and, as so modified, affirmed.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur.

Order modified, etc.