Docket No. 104853.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

ROBERT N. POINDEXTER *et al.*, Appellants, v. THE STATE OF ILLINOIS, Acting Through the Department of Human Services, *et al.*, Appellees.

*Opinion filed April 3, 2008.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

This appeal arises out of the state's administrative efforts to recover from plaintiffs costs of their respective spouses' nursing home care. Rather than exhausting administrative remedies, plaintiffs filed a suit for declaratory and injunctive relief in the circuit court of Sangamon County. They asserted that the state spousal support provisions (305 ILCS 5/10–1 through 10–28 (West 2006); 89 Ill. Adm. Code §103.10 *et seq.*) were preempted by the Medicare Catastrophic Coverage Act of 1988 (MCCA) (42 U.S.C. §1396r–5 (2000)). The circuit court found in favor of plaintiffs and enjoined the state from seeking spousal support. The appellate court reversed over

a dissent. 372 Ill. App. 3d 1021. We granted plaintiffs leave to appeal (210 Ill. 2d R. 315(a)) and affirm the appellate court.

BACKGROUND

We first discuss the federal provision at issue, then the state provision that is allegedly in conflict with it, and then the specific procedural facts of this case.

A. Medicare Catastrophic Coverage Act

Medicaid is a cooperative federal-state program authorized under Title XIX of the Social Security Amendments of 1965 (42 U.S.C. §1396 *et seq*.). It provides medical services to both the categorically needy and the medically needy. *Hines v. Department of Public Aid*, 221 Ill. 2d 222, 227 (2006). Under prior law, a couple needed to deplete nearly all of their assets before either one could satisfy Medicaid eligibility requirements, leaving the spouse who remained in the community in a financially precarious position. H.R. Rep. No. 100–105, at 69 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 892. In 1988, Congress attempted to fix the Medicaid system to prevent "spousal impoverishment." 42 U.S.C. §1396r–5 (2000); *Hines*, 221 Ill. 2d at 228. The MCCA provided a formula for allowing the institutionalization of one spouse, while keeping the spouse remaining in the community some distance from the poverty line. H.R. Rep. No. 100–105, at 69 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 892.

Another goal of the MCCA was "preventing financially secure couples from obtaining Medicaid assistance." *Wisconsin Department of Health & Family Services v. Blumer*, 534 U.S. 473, 480, 151 L. Ed. 2d 935, 944, 122 S. Ct. 962, 967 (2002), citing H.R. Rep. No. 100–105, at 65 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 888. The MCCA prevented an "institutionalized spouse" from qualifying for Medicaid by transferring his or her interest in assets to the "community spouse." See H.R. Rep. No. 100–105, at 73-74 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 896-97; *Johnson v. Guhl*, 91 F. Supp. 2d 754, 761 (D. N.J. 2000) (with the MCCA, "Congress intended to close the loophole where a couple could shelter resources in the community spouse's name while the institutionalized spouse

-2-

received Medicaid"). Therefore, the MCCA tried to balance two goals: "preventing impoverishment of the community spouse and ensuring that no one avoided contributing his or her fair amount to medical care." *Thomas v. Commissioner of the Division of Medical Assistance*, 425 Mass. 738, 740, 682 N.E.2d 874, 876 (1997).

To determine eligibility under these provisions, the state agency takes a "snapshot" of the couple's total current and forecasted resources and income as of the beginning of the first continuous period of institutionalization. See H.R. Rep. No. 100–105, at 73-74 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 896-97; *Mistrick v. Division of Medical Assistance & Health Services*, 154 N.J. 158, 171, 712 A.2d 188, 195 (1998); 42 U.S.C. §1396r–5(c)(1)(A) (2000). Based on this snapshot, the agency attributes the couple's resources and income into spousal shares by a process of "deeming" and "diversion." See M. Farley, *When "I Do" Becomes "I Don't": Eliminating The Divorce Loophole to Medicaid Eligibility*, 9 Elder L.J. 27 (2001) (noting that the key provisions of the MCCA are the "deeming" and "diversion" provisions).

The MCCA's provisions consider both income and resources in determining an applicant's eligibility. *Blumer*, 534 U.S. at 481, 151 L. Ed. 2d at 944, 122 S. Ct. at 967. Under the income category, the institutionalized spouse's income cannot exceed the maximum level set by the state. However, the community spouse's income may not be "deemed available" to the institutionalized spouse in determining eligibility. 42 U.S.C. §1396r–5(b)(1) (2000). This is often called the "name-on-the-check" rule. *Blumer*, 534 U.S. at 481, 151 L. Ed. 2d at 944, 122 S. Ct. at 967. Under this rule, a community husband's income that he retains for himself will not, under state law, be counted against (or "deemed available" to) his institutionalized spouse at the eligibility phase of the Medicaid process. *Cf. Schweiker v. Gray Panthers*, 453 U.S. 34, 44, 69 L. Ed. 2d 460, 470, 101 S. Ct. 2633, 2640 (1981).

Next, the eligibility rules look at a couple's total resources. The state agency evaluates a couple's assets collectively, regardless of ownership. This collective evaluation of the couple's assets closed the loophole that allowed the couple to shelter resources solely in the name of the community spouse. A couple's total resources must be below a certain statutorily prescribed level called the "Community

Spouse Resource Allowance" (CSRA) before the institutionalized spouse will be eligible. If the total resources are above this limit, the couple must "spend down" to gain eligibility. *Houghton v. Reinertson*, 382 F.3d 1162, 1165 (10th Cir. 2004); 42 U.S.C. §1396r–5(c)(2) (2000).[1]

The CSRA also diverts some of the institutionalized spouse's resources where the community spouse has little of his or her own resources. This may occur in the common case of a spouse who spent his or her entire career working in the home. To avoid having to "spend down" the entirety of a couple's assets to qualify the institutionalized spouse for Medicaid and thus impoverish himself or herself in the process, the community spouse is allowed to keep the CSRA. 42 U.S.C. §1396r–5(f)(2) (2000). In other words, the state agency diverts some of the instititionalized spouse's assets to the community spouse to prevent spousal impoverishment. Conversely, if the community spouse retains most of the wealth, then his or her assets must be "spent down" only to the point of the CSRA.

The MCCA also provides diversion procedures regarding the couple's income to prevent spousal impoverishment. Once eligibility is reached, the state agency reexamines the ailing spouse's income to determine how much must be contributed toward nursing home costs and whether any of it should be left available to the community spouse. The institutionalized spouse is permitted to divert a portion of monthly income to the community spouse. This deduction from the institutionalized spouse's monthly income is known as the "community spouse monthly income allowance" (CSMIA). 42 U.S.C. §1396r–5(d)(1)(B) (2000). If the community spouse's income falls below the "minimum monthly maintenance needs allowance"

---

[1] All nonexcludable resources of both spouses over and above the CSRA are to be available to pay for nursing care costs of the institutionalized spouse. See 42 U.S.C. §§1396r–5(c)(1)(A), (c)(2) (2000). The remaining resources in excess of the community resource allowance are considered available to the institutionalized spouse, who will be eligible for Medicaid only if those remaining resources are less than or equal to $2,250. 20 C.F.R. §416.1205 (2001). Any and all resources above the CSRA must then be spent before an institutionalized spouse will be eligible for medicaid.

(MMMNA), the agency allocates a portion of the institutionalized spouse's income to the community spouse. 42 U.S.C. §1396r–5(d)(3) (2000).[2] Thus, if the name-on-the-check rule does not provide the community spouse with this measure of sufficient income, the agency must look to the institutionalized spouse's income to bring the community spouse's income up to the MMMNA. 42 U.S.C. §1396r–5(d)(6) (added by Pub. L. No. 109–71, eff. February 8, 2006).

Finally, the MCCA provides a "fair hearing" procedure through which a couple may challenge the results of the state agency's "snapshot." At the fair hearing, also known as an "(e)(2)(C) hearing," the state agency can address any dissatisfaction with the CSRA and the MMMNA. 42 U.S.C. §1396r–5(e)(2)(C) (2000). For example, "[i]f the couple succeeds in obtaining a higher CSRA, the institutionalized spouse may reserve additional resources for posteligibility transfer to the community spouse. The enhanced CSRA will reduce the resources the statute deems available for the payment of medical expenses; accordingly, the institutionalized spouse will become eligible for Medicaid sooner." *Blumer*, 534 U.S. at 483-84, 151 L. Ed. 2d at 946, 122 S. Ct. at 969.

B. Spousal-Support Provisions

After the institutionalized spouse has received benefits, a state agency may seek recovery of nursing home costs from the community spouse. Other states refer to this as a "pay and chase" system. *Cf.* 372 Ill. App. 2d at 1034 (referring to Connecticut's system, whereby it cannot refuse Medicaid eligibility based on a couple's resources, but then must seek contribution from the community spouse). The State of Illinois' spousal support provisions are found in article X of the Illinois Public Aid Code (305 ILCS 5/10–1 through 10–28 (West

---

[2] The MMMNA is calculated by multiplying the federal poverty level for a couple by a percentage set by the states. Since 1992, that percentage must be at least 150% (42 U.S.C. §§1396r–5(d)(3)(A), (d)(3)(B) (2000)), but the resulting MMMNA may not exceed $1,500 per month in 1988 dollars. 42 U.S.C. §§1396r–5(d)(3)(C), (g) (2000). At the time of litigation in this case, the Illinois MMMNA, called in Illinois the "Community Spouse Maintenance Needs Standard," was $2,378.

2006)). When one spouse receives Public Aid, the other spouse is liable to the agency providing the benefits. 305 ILCS 5/10–2 (West 2006). Section 10–11 of the Code provides that if the appropriate state agency determines that a spouse owes support, the collections unit of that agency may issue an administrative order reflecting the amount owed to the state as reimbursement. 305 ILCS 5/10–11 (West 2006).

The regulations promulgated by the state provide that the Illinois Department of Human Services "shall seek to obtain support for recipients from legally responsible individuals and shall seek the enforcement of support obligations." 89 Ill. Adm. Code §103.10. However, "the Department shall not seek to obtain support for residents of long term care facilities if income of the spouse in the community is less than or equal to the" MMMNA. 89 Ill. Adm. Code §103.10. In other words, the state may only recover from a community spouse whatever monies that spouse may have in addition to the MMMNA. Above that limit, 1% per month of the community spouse's gross annual income earned above $7,000 will be assessed as responsible-relative liability. 89 Ill. Adm. Code §103.20(a)(2); §103, Table A. The responsible family member must submit a copy of his or her most recent federal income tax return for this determination; otherwise that person is held liable for the full amount of the assistance provided. 89 Ill. Adm. Code §103.20.

An administrative support order becomes "final" if the person receiving the order fails to timely seek an administrative hearing. 305 ILCS 5/10–12, 10–13 (West 2006). Review of administrative findings may be made pursuant to section 10–11 of the Public Aid Code (305 ILCS 5/10–11 (West 2006)), and final agency determinations can be challenged under the Administrative Review Law (735 ILCS 5/3–102 (West 2006)).

## C. Procedural History

The State of Illinois, acting through the Illinois Department of Public Aid (Public Aid) and the Illinois Department of Human Services (Human Services), administratively adjudged and sought spousal support from certain plaintiffs for their institutionalized spouses. Rather than proceeding with further administrative options,

on July 22, 2004, plaintiffs Robert Poindexter, Mirl Whitaker, Maurice Hardy, Virginia McCulley, and Roger Meredith filed a complaint, in the circuit court of Sangamon County, for declaratory and injunctive relief against the state, Public Aid, Human Services, and the directors of the relevant state agencies (hereinafter, defendants).

Plaintiffs alleged that each plaintiff was the "community spouse" of an "institutionalized spouse" receiving medical assistance under the Medicaid program administered by the State of Illinois. Plaintiffs claimed that article X and its implementing regulations conflicted with the MCCA, and thus were preempted pursuant to the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2). The MCCA, according to plaintiffs, prohibited the collection of income from the community spouse after the eligibility determination. They principally cited section 1396r–5(b)(1), which provides as follows: "During any month in which an institutionalized spouse is in the institution, except as provided in paragraph (2), no income of the community spouse shall be deemed available to the institutionalized spouse." 42 U.S.C. §1396r–5(b)(1) (2000). According to plaintiffs, this section prohibits the state from seeking a contribution for the nursing home costs from the community spouse as long as the institutionalized spouse remained in the institution. Therefore, plaintiffs sought a declaration that Illinois' spousal support provisions, article X and its companion regulations, conflict with the MCCA and thus are preempted under the supremacy clause (U.S. Const., art. VI, cl. 2). Plaintiffs sought to permanently enjoin the defendants from undertaking any further collection efforts. They additionally asked for an order accounting for all the monies defendants had received from plaintiffs and requiring defendants to refund those sums, and to pay their litigation costs, expenses, and reasonable attorney fees.

Defendants filed a motion to dismiss under section 2–619(1) of the Code of Civil Procedure (735 ILCS 5/2–619(1) (West 2006)) based on plaintiffs' alleged failure to exhaust their administrative remedies as provided by the Public Aid Code and the Administrative Review Law. According to documents submitted by defendants to the trial court, plaintiff Poindexter had been issued an administrative order requiring him to pay $19,902 to reimburse Human Services for

payments made on behalf of his wife. Human Services also issued Poindexter an ongoing assessment for her continued care of $1,210 a month. Poindexter did not seek a hearing from Human Services within the time provided by the Code. He also did not seek review of a subsequent order denying him a hearing because the request for a hearing he eventually made was untimely. Defendants also contended that plaintiffs Meredith and Hardy were subject to administrative support orders, but they also failed to seek administrative hearings with Human Services to contest the orders. Defendants' documents further showed that plaintiff Whitaker refused to answer a subpoena directed to him by Human Services requesting information regarding his income. Plaintiff McCulley also failed to provide Human Services with requested information, although a Human Services local office had information that her income from an annuity, beginning in November 2003, exceeded $8,300 per month. The trial court denied the defendants' motion to dismiss.[3]

The original plaintiffs filed a motion entitled "Argument," which the trial court treated as a motion for summary judgment. In ruling in favor of plaintiffs, the trial court noted the MCCA makes it clear that income is attributable to the spouse to whom it is paid, *i.e.*, the "name-on-the-check" rule. Among other findings, the trial court stated:

> "[T]he MCCA does not distinguish between eligibility and post-eligibility support, it rather plainly states: 'During *any* month in which an institutionalized spouse is in the institution; except as provided in paragraph (2), *no income* of the community spouse shall be deemed available to the institutionalized spouse.' The MCCA expressly states that 'no income' of a community spouse may be deemed available to

---

[3] The trial court later allowed motions to join by Orville Davis, Catherine Josephson, Margaret Gonet, and Mary Lou Dickens. They all alleged that they were community spouses of institutionalized spouses, that the issues were the same as those of the other plaintiffs, and that granting the motion would be in the interests of judicial economy. The record does not reveal that defendants filed a specific motion to dismiss as to these plaintiffs.

an institutionalized spouse in 'any month,' during which the institutionalized spouse receives medical assistance." (Emphases in original.)

The trial court enjoined defendants from seeking any support from community spouses for any month in which the institutionalized spouse is receiving Medicaid. It also ordered that the plaintiffs recover costs and expenses.

Defendants appealed, and the appellate court reversed. The appellate court first rejected the defendants' argument that plaintiffs failed to exhaust administrative remedies. The appellate court found that the issue raised was purely one of law and "is not an issue that falls within the particular expertise of an administrative agency, especially considering it involves the interpretation of a federal statute." 372 Ill. App. 3d at 1025. The court noted that unlike the situation presented in *Arvia v. Madigan*, 209 Ill. 2d 520 (2004), none of plaintiffs' claims are specifically required by statute to be brought before an administrative law judge. Further, following *Arvia*, plaintiffs' claims are purely constitutional and there are no factual disputes. 372 Ill. App. 3d at 1025-26.

Next, the appellate court addressed the preemption issue. The court examined the language of the MCCA and stated:

"The introductory language of the MCCA clearly states that the provisions of the MCCA are for the purposes of determining Medicaid eligibility, which would not include issues involving ongoing spousal support. To read the subsection that states 'no income of the community spouse' that plaintiffs rely on as extending beyond the scope of an eligibility determination would essentially render the introductory language meaningless." 372 Ill. App. 3d at 1029.

The court also noted that the word "deem" is a term of art in the Medicaid context, used for purposes of determining eligibility. 372 Ill. App. 3d at 1029. Assets owned by each spouse are added together, and each spouse is "deemed" to own half, irrespective of any state's laws concerning community property. 372 Ill. App. 3d at 1029-30, citing *Schweiker*, 453 U.S. at 44-45, 69 L. Ed. 2d at 470, 101 S. Ct. at 2640-41. Since the MCCA clearly indicates that it is intended to apply to determinations of eligibility, the clause plaintiffs rely on, "no

income of the community," is clearly only in relation to determinations of eligibility. 372 Ill. App. 3d at 1029. Justice Knecht dissented, stating, in part: "I agree with the trial court: the MCCA restricts the State from seeking support from the income of a community spouse, even if his or her income is more than the monthly needs allowance, for his or her 'institutionalized spouse' receiving Medicaid." 372 Ill. App. 3d at 1036 (Knecht, J., dissenting).

We granted leave to appeal (210 Ill. 2d R. 315(a)).

## ANALYSIS

We address two issues: whether plaintiffs were required to exhaust administrative remedies before they sought declaratory and injunctive relief in circuit court; and whether the MCCA preempts state spousal support provisions.

## I

We first address defendants' contention that plaintiffs' complaint for declaratory relief pursuant to the Illinois declaratory judgment statute (735 ILCS 5/2–701(a) (West 2006)) should be dismissed due to failure to exhaust administrative remedies.[4] Section 2–619 permits a dismissal after the trial court considers issues of law or easily

---

[4] Plaintiffs initially challenge this argument by claiming that defendants were required to raise it in a cross-appeal. We disagree. Rule 318(a) (155 Ill. 2d R. 318(a)) provides that in all appeals "any appellee, respondent, or coparty may seek and obtain any relief warranted by the record on appeal without having filed a separate petition for leave to appeal or notice of cross-appeal or separate appeal." This court has invoked Rule 318(a) in finding that allowance of one party's petition for leave to appeal brings before this court the other party's requests for cross-relief. See *Heastie v. Roberts*, 226 Ill. 2d 515, 546 (2007); *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 242 (2006); *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.*, 186 Ill. 2d 472, 490 (1999). We do note, however, that plaintiffs correctly point out that the cover of defendants' brief did not request cross-relief. Rule 315(h) provides: "If the brief of the appellee contains arguments in support of cross-relief, the cover of the brief shall be captioned: 'Brief of Appellee. Cross-Relief Requested.' " 210 Ill. 2d R. 315(h).

proved issues of fact. 735 ILCS 5/2–619 (West 2006); *Czarobski v. Lata*, 227 Ill. 2d 364 (2008). The question on appeal is "whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993). Our review proceeds *de novo*. *Czarobski v. Lata*, 227 Ill. 2d at 369.

Defendants first argue that plaintiffs Poindexter, Meredith, and Hardy failed to exhaust administrative remedies, including failing to raise their constitutional claim at the administrative level. Defendants cite two statutes as affirmative matter to defeat the plaintiffs' complaint: (1) before filing suit, plaintiffs failed to exhaust their administrative remedies, as required by section 10–11 of the Public Aid Code (305 ILCS 5/10–11 (West 2006)); and (2) plaintiffs were required to file an administrative review complaint under the Administrative Review Law (735 ILCS 5/3–102 (West 2006)). Plaintiffs respond that this is a facial challenge to the statute, falling within a recognized exception to the exhaustion doctrine.

Courts apply the exhaustion doctrine to declaratory judgment actions. *Beahringer v. Page*, 204 Ill. 2d 363, 374 (2003). Generally, a party aggrieved by an administrative action must first pursue all available administrative remedies before resorting to the courts. *Canel v. Topinka*, 212 Ill. 2d 311, 320 (2004). The purpose of the exhaustion doctrine is to allow administrative bodies to develop a factual record and to permit them to apply the special expertise they possess. *Canel*, 212 Ill. 2d at 320-21. Exhaustion also minimizes interruption of the administrative process. Moreover, the aggrieved party might succeed before the administrative body, obviating the need for judicial involvement, thereby conserving judicial resources. *Canel*, 212 Ill. 2d at 320-21. If a challenging party alleges that a facially valid statute has been applied in an arbitrary or discriminatory manner, " 'the rule generally prevails that recourse must be had in the first instance to the appropriate administrative board.' " *Beahringer*, 204 Ill. 2d at 374, quoting *Bank of Lyons v. County of Cook*, 13 Ill. 2d 493, 495 (1958). The exhaustion doctrine also precludes review where the Administrative Review Law provides a remedy. *Canel*, 212 Ill. 2d at 321.

A party who challenges the validity of a statute on its face, however, is not required to exhaust administrative remedies. *Arvia*, 209 Ill. 2d at 532. "The reason for this exception is apparent: administrative review is confined to the proofs offered and the record created before the agency." *Arvia*, 209 Ill. 2d at 532-33. "A facial attack to the constitutionality of a statute, which presents purely legal questions, is not dependent for its assertion or its resolution on the administrative record." *Arvia*, 209 Ill. 2d at 533; see also *Canel*, 212 Ill. 2d at 321 ("An aggrieved party may seek judicial review of an administrative decision without complying with the exhaustion of remedies doctrine where a statute *** is attacked as unconstitutional on its face"); *Landfill, Inc. v. Pollution Control Board*, 74 Ill. 2d 541, 550 (1978) ("Exhaustion is not required where a statute or rule under which an administrative body purports to act is challenged as unauthorized, since the judicial determination will affect the jurisdiction of the administrative body in all matters, not only in the instant circumstances"). Further, there is virtually no chance the aggrieved party will succeed before an agency where the issue is the agency's own assertion of authority. *Landfill*, 74 Ill. 2d at 550-51.

Here, we are asked to decide whether the MCCA preempts the spousal support law: a direct challenge to the authority of the defendants to act in this manner. There has been no allegation that the defendants misapplied the statute or regulation at issue or applied it in an arbitrary manner. The complaint alleges Illinois' provisions conflict with federal law in violation of the United States Constitution. Therefore, this matter falls squarely within an exception to the exhaustion requirement, and defendants' argument on this point is rejected.

We next reject defendants' argument that six of the other plaintiffs, Whitaker, McCulley, Davis, Josephson, Gonet, and Dickens, should have been dismissed because they had not yet received final administrative orders, citing *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381 (1994). We first note that defendants never filed a motion to dismiss as to plaintiffs Whitaker, Davis, Josephson, Gonet, or Dickens. Nevertheless, even if defendants' motions as to those plaintiffs were not forfeited, we would reject it. In *National Marine*, we noted that in cases involving challenges to administrative actions, application of

the ripeness doctrine prevents courts " ' "from entangling themselves in abstract disagreements over administrative policies" ' " and " ' "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." ' " *National Marine*, 159 Ill. 2d at 388, quoting *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540, 546 (1977), quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515 (1967). There, the Illinois Environmental Protection Agency had issued a notice informing the plaintiff that it could be potentially liable for a " 'release or a substantial threat of a release of a hazardous substance' " on the property pursuant to section 4(q) of the Act. *National Marine*, 159 Ill. 2d at 383, quoting Ill. Rev. Stat. 1991, ch. 111½, par. 1004(q). This court noted that the "complaint, in essence, sought to obtain judicial review of the Agency's issuance of the 4(q) notice prior to the Agency's initiation of cost-recovery/enforcement proceedings before the Pollution Control Board (Board) or the circuit court." *National Marine*, 159 Ill. 2d at 385. We found, "at this preliminary stage in the administrative process, it is not clear whether the Agency will even initiate a cost-recovery/enforcement proceeding against plaintiff before one of these bodies. Clearly, under the circumstances, plaintiff's complaint is premature." *National Marine*, 159 Ill. 2d at 390-91.

None of those considerations are present in this case. Both parties admit that there are no issues of fact and that an interpretation of the MCCA in light of the spousal support laws is all that is required. The monetary amounts have been determined and are not challenged by the community spouses. Unlike *National Marine*, in this case there are no abstract issues that this court faces. We therefore reject defendants' exhaustion argument and turn to consideration of whether article X is preempted by the MCCA.

II

As to the preemption issue, plaintiffs submitted to the trial court a brief entitled "Argument," which the defendants, the trial court and the appellate court treated as a motion for summary judgment. Because both parties agree that this case requires only an interpretation of the MCCA in light of Illinois' spousal support

provisions, and admit that there are no issues of fact, we will do the same. Summary judgment is appropriate where the pleadings show that there is no genuine issue as to any material fact. 735 ILCS 5/2–1005(c) (West 2006). All cases involving summary judgment are reviewed *de novo*. *Sun Life Assurance Co. of Canada v. Manna*, 227 Ill. 2d 128 (2007); see also *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 15 (2006) ("[w]hether state law is preempted by a federal statute is a question of law, subject to *de novo* review").

The supremacy clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States *** shall be the supreme Law of the Land *** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. "State law is preempted under the supremacy clause in three circumstances: (1) when the express language of a federal statute indicates an intent to preempt state law; (2) when the scope of a federal regulation is so pervasive that it implies an intent to occupy a field exclusively; and (3) when state law actually conflicts with federal law." *Village of Mundelein v. Wisconsin Central R.R.*, 227 Ill. 2d 281, 288 (2008), citing *English v. General Electric Co.*, 496 U.S. 72, 78-79, 110 L. Ed. 2d 65, 74, 110 S. Ct. 2270, 2275 (1990). The determination of whether state law is preempted turns on the intent of Congress. *Village of Mundelein*, 227 Ill. 2d at 288, citing *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 604, 115 L. Ed. 2d 532, 542, 111 S. Ct. 2476, 2481 (1991).

Here, although plaintiffs apparently contend that all three circumstances are present in this case, their arguments as to the first two circumstances amount to little more than one-sentence conclusions. See *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited"). Rather, plaintiffs' argument centers on the third circumstance of preemption, whether the state law actually conflicts with federal law. Plaintiffs contend that MCCA section 1396r–5(b)(1) prohibits defendants from collecting spousal support under article X. Defendants argue that section 1396r–5(b)(1) applies only to eligibility determinations. They emphasize eligibility language throughout the MCCA, and also point out that the "deemed eligible" language contained in subsection (b)(1) applies only to eligibility determinations. We agree with defendants.

-14-

A careful review of the language of the MCCA reveals an absence of consideration of the spousal support laws of which plaintiffs complain. Rather, it sets out a mechanism of deeming and diversion to implement the MCCA's twin goals of ameliorating spousal impoverishment and "preventing financially secure couples from obtaining Medicaid assistance." *Blumer*, 534 U.S. at 480, 151 L. Ed. 2d at 944, 122 S. Ct. at 967, citing H.R. Rep. No. 100–105, at 65 (1988). To achieve this, Congress directed that the state agency, in making its eligibility determination, take a "snapshot" of the couple's current and future resources to determine what income needed to be deemed to the institutionalized spouse and what income needed to be diverted to the community spouse. This is indicated in several ways.

We first examine the introductory section, subsection (a), which reveals it is aimed at determining "eligibility," as it states:

> "(a) Special treatment for institutionalized spouses
>
> (1) Supersedes other provisions
>
> *In determining the eligibility* for medical assistance of an institutionalized spouse *** the provisions of this section supersede any other provision of this subchapter *** which is inconsistent with them." (Emphasis added.) 42 U.S.C. §1396r–5(a)(1) (2000).

This indicates the statute concerns rules enabling institutionalization of an ailing spouse. Thus, the remainder of the statute is to be read with this eligibility determination in mind. Notably absent from this section is any language prohibiting a state from obtaining reimbursement of medical expenditures through spousal support laws.

Next, we note that the MCCA's provisions concerning "rules for treatment of income," found in subsection (b), relate to this eligibility determination. It contains two subsections: (b)(1), entitled "separate treatment of income"–the name-on-the-check rule–which relates to deeming; and (b)(2), entitled "attribution of income," which relates to diversion.

The name-on-the-check rule properly assures that the Medicaid eligibility determination for the ailing spouse takes into account only income over which the ailing spouse has actual control. It provides:

> "(1) Separate Treatment of Income

> During any month in which an institutionalized spouse is in the institution, except as provided in paragraph (2), no income of the community spouse shall be *deemed available* to the institutionalized spouse." (Emphasis added.) 42 U.S.C. §1396r–5(b)(1) (2000).

This provision prevents the state agency from looking at a community spouse's income to prevent the receipt of benefits by an ailing spouse. Furthermore, this section of the statute does not reference spousal support laws in any way.

Moreover, this section–the name-on-the-check rule–uses a term of art, "deemed available," which points to eligibility determinations. The United States Supreme Court explained the genesis of this "deemed available" language, stating, "Until 1989, the year the MCCA took effect, States generally considered the income of either spouse to be 'available' to the other. We upheld this approach in *Gray Panthers*, observing that 'from the beginning of the Medicaid program, Congress authorized States to presume spousal support.' " *Blumer*, 534 U.S. at 479, 151 L. Ed. 2d at 944, 122 S. Ct. at 967, quoting S. Rep. No. 89–404, at 78 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 2018. The Court then described how the MCCA changed this determination after 1989–providing that a spouse's income shall *not* be deemed available to the other. It stated, referring to subsection (b)(1), "The community spouse's income is thus preserved for that spouse and does not affect the determination whether the institutionalized spouse qualifies for Medicaid. In general, such income is also disregarded in calculating the amount Medicaid will pay for the institutionalized spouse's care after eligibility is established." *Blumer*, 534 U.S. at 480-81, 151 L. Ed. 2d at 944, 122 S. Ct. at 967. Further, as the United States Supreme Court observed in *Blumer*, this "deemed available" language applied to the couple's resources as well. *Blumer*, 534 U.S. at 479-80, 151 L. Ed. 2d at 944, 122 S. Ct. at 967 ("Similarly, assets held jointly by the couple were commonly *deemed 'available'* in full to the institutionalized spouse" (emphasis added)). Accordingly, subsection (b)(1) must be construed in light of the MCCA mechanisms to avoid spousal impoverishment and prevent financially secure couples from receiving benefits. Indeed, our research reveals that prior courts have only construed this language in terms of its effect on the

-16-

institutionalized spouse's eligibility. See, *e.g.*, *Arkansas Department of Health & Human Services v. Smith*, 370 Ark. 490, ___ S.W.3d ___ (2007); *In re Estate of Tomeck*, 8 N.Y.3d 724, 872 N.E.2d 236, 840 N.Y.S.2d 550 (2007); *King v. Secretary, Louisiana Department of Health & Hospitals*, 956 So. 2d 666 (La. App. 2007).

The next "rule for treatment of income," subsection (b)(2), provides guidance for "determining the income of an institutionalized spouse or community spouse for purposes of the post-eligibility income determination described in subsection (d)." 42 U.S.C. §1396r–5(b)(2) (2000). The language of subsection (b)(2) is limited to attributing income between spouses to provide the income values needed in subsection (d) and was not directed to state spousal support laws. In turn, subsection (d) is entitled "Protecting income for community spouse" and refers to a procedure for raising an impoverished community spouse's income. 42 U.S.C. §1396r–5(d) (2000). Subsections (d)(1)(B), (d)(2), and (d)(3) provide for the allocation of available income from the institutionalized spouse to the community spouse to maintain a minimum monthly income, or MMMNA, when the community spouse's own income is below that level. 42 U.S.C. §1396r–5(d)(2) (2000). Subsection (2) defines the difference between the MMMNA and the community spouse's income as the "community spouse monthly income allowance." 42 U.S.C. §1396r–5(d)(2) (2000). The community spouse monthly income allowance, along with other allowances defined in subsection (d), is deducted from the institutionalized spouse's income before determining the amount of the institutionalized spouse's income, as determined in subsection (b), must be paid toward the costs of institutional care. Thus, Congress intended subsection (d) to prevent impoverishment of the community spouse by permitting income to be allocated to that spouse from the institutionalized spouse when necessary. This provision is not directed at spousal support laws such as article X, where the community spouse may be required to reimburse the state for some of the cost of care provided to the institutionalized spouse.

Finally, the remainder of the MCCA regarding the CSRA, MMMNA and the "fair hearing" is peppered with language referring to the eligibility determination when the agency takes its "snapshot." See 42 U.S.C. §§1396r–5(c)(1) ("Computation of spousal share at

time of institutionalization"), 1396(c)(1)(A) ("There shall be computed [ ]as of the beginning of the first continuous period of institutionalization"), 1396r–5(c)(1)(B) ("At the request of an institutionalized spouse or community spouse, at the beginning of the first continuous period of institutionalization"), 1396r–5(c)(2) ("Attribution of resources at time of initial eligibility determination[.] *** In determining the resources of an institutionalized spouse at the time of application for benefits under this subchapter"), 1396r–5(d)(1) ("After an institutionalized spouse is determined or redetermined to be eligible for medical assistance"), 1396r–5(e)(1)(A) ("a determination of eligibility"), 1396r–5(e)(2)(A) ("If either *** spouse is dissatisfied with a determination of"), 1396r–5(e)(2)(A) ("with respect to such determination if an application for benefits under this subchapter has been made on behalf of the institutionalized spouse"). These provisions indicate that the MCCA is only concerned with "diversion" after eligibility has been determined. It makes no further provisions for the income of a community spouse which may be above the MMMNA, except to the extent that a community spouse may request a "fair hearing" to raise the MMMNA or CSRA.

Thus, the community spouse's income becomes an issue only when he or she does not receive sufficient income to cover the basic costs of living. In that case, he or she may seek, through a "fair hearing," a portion of the institutionalized spouse's income to help defray necessary costs.[5] This accords with the purposes of the Act: to prevent impoverishment of the community spouse and to prevent financially secure couples from receiving benefits. As the court illustrated in *Blumer*,

> "Although that hearing is conducted preeligibility, its purpose is to anticipate the *posteligibility* financial situation of the couple. The procedure seeks to project what the community spouse's income *will be* when the institutionalized spouse becomes eligible. See Tr. of Oral Arg. 14 (officer conducting

---

[5] Plaintiffs do not argue that defendants' spousal support provisions threaten to impoverish them in violation of the MCCA. They further do not argue that they could potentially make use of this fair hearing mechanism in order to protect any of their income from defendants spousal support order.

(e)(2)(c) hearing makes a calculation that 'concerns the post eligibility period'; question is will 'the at-home spouse ... have sufficient income in the post eligibility period, or does the resource allowance need to be jacked up in order to provide that additional income'). The hearing officer must measure that projected income against the MMMNA, a standard that, like the CSMIA, is operative only posteligibility." (Emphases in original.) *Blumer*, 534 U.S. at 491, 151 L. Ed. 2d at 951, 122 S. Ct. at 973.

Accordingly, while the MCCA addresses the posteligibility income of a potentially impoverished spouse, it says nothing about the state's ability to seek reimbursement from an otherwise financially secure community spouse.

The plaintiffs further argue the appellate court improperly limited the MCCA to the first eligibility determination, pointing out that eligibility is an ongoing, monthly proposition. But the court did not do so; it merely stated that the eligibility determination does not include issues of ongoing spousal support owed to the state. 372 Ill. App. 3d at 1029. Nevertheless, although an institutionalized spouse's Medicaid eligibility may be redetermined each month, this is irrelevant to the community spouse's state-law obligation to pay spousal support when their community-spouse income exceeds the MMMNA.

We therefore find that the MCCA does not preempt article X of the Public Aid Code. Accordingly, the appellate court correctly reversed the trial court's grant of declaratory, injunctive, and other relief to the plaintiffs.

CONCLUSION

For the foregoing reasons, we find that plaintiffs were not required to exhaust administrative remedies and that the MCCA does not preempt article X of the Public Aid Code. Therefore, we affirm the judgment of the appellate court which reversed the trial court.

*Affirmed*.