SECOND DIVISION
FILED: June 24, 2008

No. 1-07-2623

| | | |
|---|---|---|
| MARIA KOUZOUKAS. | ) | APPEAL FROM THE |
| | ) | CIRCUIT COURT OF |
| Plaintiff-Appellee, | ) | COOK COUNTY |
| | ) | |
| v. | ) | |
| | ) | |
| THE RETIREMENT BOARD OF THE POLICEMEN'S | ) | |
| ANNUITY AND BENEFIT FUND OF THE CITY OF | ) | |
| CHICAGO, | ) | HONORABLE |
| | ) | PHILIP L. BRONSTEIN, |
| Defendant-Appellant. | ) | JUDGE PRESIDING. |

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago (Board) appeals from orders of the circuit court which reversed a decision of the Board denying the plaintiff, Maria Kouzoukas, duty disability benefits under section 5-154 of the Illinois Pension Code (Code) (40 ILCS 5/5-154 (West 2004)) and awarded the plaintiff pre-judgment interest. For the reasons which follow, we affirm.

The following facts relevant to our disposition of this appeal are taken from the evidence presented at the hearing held by the Board on the plaintiff's application for duty disability benefits.

The plaintiff was appointed a member of the Chicago Police Department (Department) on December 4, 1995. On July 25, 2004, she was assigned to the 16th police district. While working on that

No. 1-07-2623

date, the plaintiff attempted to assist an intoxicated man who was bleeding and lying on a sidewalk. According to an affidavit filed by the plaintiff, the intoxicated individual resisted her efforts and, in the altercation which ensued, she injured her back. The plaintiff sought treatment at the Resurrection Medical Center (Resurrection) emergency room. The records of that visit state that she complained of pain in her lower back and left foot. The plaintiff was diagnosed as suffering from a contusion on her left foot, a lower-back strain, and pain in her chest wall. On discharge from the emergency room, the plaintiff was given medication for pain; restricted to limited bending, stooping, twisting and forceful pushing or pulling for the following 72 hours; and advised to seek follow-up care with her own physician.

On July 26, 2003, the plaintiff went on medical leave from the Department. On the following day, she sought treatment from Dr. Edward Bleier at Mercyworks Occupational Medical Center. The doctor's records of that visit state that the plaintiff complained of pain in her lower back, but denied any residual discomfort involving her left foot. Dr. Bleier diagnosed an acute lumbar strain, prescribed pain medication and a home exercise program for the plaintiff, and authorized her to remain off work.

On August 10, 2004, the plaintiff was examined by Dr. Michael S. Lewis at the Illinois Bone & Joint Institute. In a report of that examination, Dr. Lewis noted a mild paravertebral muscle spasm in the dorsal and lumbar areas of the plaintiff's spine. The

2

doctor also noted that the plaintiff had full motion of both upper and lower extremities and that her neurovascular status was intact. Dr. Lewis diagnosed the plaintiff as having suffered an acute dorsal and lumbar myofasciitis.

The plaintiff continued under the care of Dr. Lewis and continued to complain of pain in her low-back area. When she was seen by the doctor on August 23, 2004, and September 7, 2004, he noted a persistence of the plaintiff's low-back symptoms. Dr. Lewis prescribed medication for the plaintiff and recommended that she remain off work.

Dr. Lewis' report of the claimant's examination on September 14, 2004, states that she continued to complain of low-back pain. Nevertheless, Dr. Lewis authorized her to return to work in a light-duty capacity on September 17, 2004.

When the plaintiff was seen by Dr. Lewis on October 12, 2004, she continued to complain of daily back pain but reported that she had been able to perform light-duty activities at work. Dr. Lewis recommended that she continue light-duty work, prescribed a course of physical therapy, and ordered an MRI scan of the plaintiff's lumbosacral spine.

The claimant began physical therapy at Athletico on October 15, 2004. However, the Department's records reflect that, on October 23, 2004, the plaintiff again went on medical leave as the result of the back injury she received while on duty.

The MRI scan of the plaintiff's lumbar spine that Dr. Lewis

3

recommended was performed at Resurrection on October 27, 2004. The radiologist's report of that scan noted mild disc protrusions at L4-L5 and L5-S1 with bilateral neural stenosis, most severe at L4-L5.

When the plaintiff saw Dr. Lewis on October 28, 2004, she complained of low-back pain, radiating into her right lower extremity, and reported that her symptoms intensified with sitting. Dr. Lewis examined the plaintiff and diagnosed lumbar radiculitis. He prescribed an epidural steroid injection, and recommended that the plaintiff remain off work.

Dr. Lewis next saw the plaintiff on November 8, 2004. In his report of that visit, Dr. Lewis wrote that, although the plaintiff continued to have low-back pain, her radicular pain was much improved. According to the report, Dr. Lewis examined the plaintiff and reviewed her MRI scan. He concluded that the findings were compatible with a lumbar radiculitis and a persistent lumbar myofasciitis. He advised the claimant to continue with physical therapy and authorized her to return to light-duty work on November 12, 2004, and regular duty work on November 22, 2004.

It appears that the plaintiff returned to duty on November 12, 2004, but again went on medical leave on November 16, 2004.

The plaintiff underwent physical therapy at Athletico. In a letter dated November 30, 2004, Derick Sy, a physical therapist at Athletico, reported to Dr. Lewis that the plaintiff attended five sessions of physical therapy from October 15, 2004, through

4

November 1, 2004, but that she had missed two sessions and cancelled another. According to the report, the plaintiff was discharged from therapy when she failed to return after her November 1, 2004, visit and failed to return telephone calls requesting that she reschedule appointments. The report states that, at the time of her last visit, the plaintiff continued to complain of back pain and mid-back muscle spasms and that she was unable to run or "work out."

The plaintiff returned to light-duty work on January 17, 2005. She worked in that capacity until March 29, 2005, when she again went on medical leave.

On April 5, 2005, the plaintiff had an MRI scan of her cervical spine on orders of Dr. Peter Petrovas, a chiropractor. The radiologist's report states that the scan of the cervical spine and the spinal cord was normal.

On May 2, 2005, the plaintiff was examined by Dr. Gary Mages at the Advocate Good Shepard Hospital. Dr. Mages recommended that the plaintiff undergo an L4-L5 transforaminal epidural injection.

When the plaintiff was examined by Dr. Lewis on May 19, 2005, she reported that, in March, she had a recurrence of severe low-back pain, radiating into her right leg, and that she was unable to work. On examination, Dr. Lewis found a "severe paravertebral muscle spasm in the plaintiff's lumbar spine with minimal forward flexion." In his report of that visit, Dr. Lewis recorded an impression of "acute lumbar radiculitis secondary to a recurrence

of a work related back injury which originally occurred in June of 2004." As of that date, Dr. Lewis found that the plaintiff was unable to work, and he recommended that she have an epidural steroid injection.

Dr. Henry Kurzydlowski administered the recommended epidural injection on June 7, 2005. However, when the plaintiff saw Dr. Lewis on June 13, 2005, she reported that the injection had afforded no relief from her symptoms. According to Dr. Lewis' notes, the plaintiff reported a headache and increased low-back pain post-injection. Dr. Lewis again found the plaintiff unable to work, and, based upon her lack of response to conservative treatment, the doctor recommended that she see a spine surgeon to be evaluated for possible surgical intervention.

On July 19, 2005, the plaintiff was examined by Dr. David Spencer. In a report of that visit addressed to the Department's medical section, Dr. Spencer wrote that his working diagnosis was chronic-back pain and right-sided sciatica. He recommended that the plaintiff continue in a light-duty status and that she undergo a new MRI scan of her lumbar spine.

The plaintiff had an MRI scan of her lumbar spine on August 4, 2005, at the Parkside Magnetic Resonance Center. The radiologist's report of the scan states that no abnormalities were detected.

The plaintiff returned to see Dr. Spencer on August 8, 2005. In his report of that visit, addressed to the Department's medical section, Dr. Spencer wrote that the plaintiff "does not really have

a back problem or an injury." Dr. Spencer also wrote that, based upon the pristine appearance of the plaintiff's spine on the MRI, he was of the belief that her pain is not coming from any identifiable injury in her lumbar spine. The report states that he discussed the implications with the plaintiff and recommended that she consult with her gynecologist and general internist in order to identify the source of her pain. Dr. Spencer released the plaintiff to return to work with a temporary 20-pound bending and lifting restriction.

On September 2, 2005, the plaintiff was examined by Dr. Wesley Yapor, a neurosurgeon. At the time of that visit, Dr. Yapor reviewed the MRI scan of the claimant's spine that was taken in October of 2004. He did not, however, review the MRI scan of the plaintiff's spine that was taken in August of 2005. Dr. Yapor ordered an EMG study of the plaintiff's lower extremities and recommended that she remain off work until he could further evaluate her condition with the results of the studies.

The plaintiff had an EMG/NCV study and next saw Dr. Yapor on September 30, 2005. According to Dr. Yapor's report of that visit, the EMG study "revealed no neurological finding suggestive of radiculopathy or plexopathy." Nevertheless, Dr. Yapor recommended that the plaintiff remain off work until she could have an x-ray of her S1 joint in order to rule out any pathology in that area.

In a report dated October 18, 2005, Dr. Yapor wrote that the plaintiff had a CT scan of her sacroiliac joint. Although the scan

7

showed a slight narrowing of the joint space, Dr. Yapor saw no specific pathology. When he examined the plaintiff on that date, Dr. Yapor detected "significant point tenderness right over the right sacroiliac joint." Dr. Yapor recommended that the plaintiff remain off work until she was able to run and suggested that her best option was to enroll in a pain management program to evaluate her for possible steroid and local anesthetic injections to the sacroiliac joint and for other types of therapy or medications.

The plaintiff was evaluated at the Comprehensive Pain Management Group on November 17, 2005. The report of the evaluation states that, after an extensive physical examination, the plaintiff was diagnosed as suffering from low-back pain with right radicular-leg pain. Lyrica was prescribed for the plaintiff's pain, and she was asked to obtain her MRI scans and EMG study.

When the plaintiff was examined by Dr. Yapor on November 22, 2005, she continued to complain of pain. He recommended that she remain off work until she could be re-evaluated by Comprehensive Pain Management Group.

On December 13, 2005, Dr. Yapor authored a report addressed to the Department's medical section in which he wrote that the plaintiff's low-back symptoms had not changed in pattern or in the degree of pain that she experienced and that her level of disability has continued with discomfort upon prolonged sitting, standing, and walking. He also reported that the plaintiff is

8

unable to run. According to Dr, Yapor's report, the plaintiff "should be considered to have a chronic low back syndrome which, although is causing no neurological deficit, is causing her to have sufficient disability for her not to be able to perform her job duties as a police officer." Dr. Yapor opined that the plaintiff is permanently disabled.

On December 15, 2005, the plaintiff filed an application with the Board for an award of duty disability benefits pursuant to the provisions of the Code.

On December 19, 2005, Dr. Yapor discharged the plaintiff from his care after having reviewed a "normal MRI" of her cervical spine. His report to the Department's medical section states that, although the plaintiff needed no further follow-up care from a neurological standpoint, she would need further follow-up at the Comprehensive Pain Management Group.

On December 20, 2005, Dr. Howard Konowitz of the Comprehensive Pain Management Group administered an S1 joint injection to the plaintiff. In a report to Dr. Yapor dated January 20, 2006, Dr. Konowitz wrote that the plaintiff experienced significant improvement with the injection, but that she still suffered pain.

On December 29, 2005, the plaintiff was examined by the Board's physician, Dr. S. David Demorest. In a report of that examination dated January 21, 2006, Dr. Demorest noted that the plaintiff has "exaggerated lumbar lordosis" and that he detected a "marked spasm of the perispinal muscles on the left from

approximately T7 to the lower lumbar." Dr. Demorest also noted that the plaintiff had decreased forward flexion and lateral bending, although her reflex examination was normal. According to Dr. Demorest's report, the plaintiff has myofascial pain syndrome and should continue with pain management.

The plaintiff was again examined by Dr. Konowitz at the Comprehensive Pain Management Group offices on March 23, 2006. In a report of that examination, Dr. Konowitz wrote that the plaintiff's S1 joint pain is provoked with prolonged sitting and standing. Dr. Konowitz stated that, due to the plaintiff's "significant subjective complaints" of pain over her S1 joint, he was unable to authorize her return to duty.

The hearing on the plaintiff's application for benefits commenced before the Board on March 30, 2006. At that hearing, the first witness to testify was Dr. Yapor. Dr. Yapor was questioned about his treatment of the plaintiff and his review of her medical records and MRI scans. He stated that he was of the belief that the pain that the plaintiff experiences is generated by her sacoriliac joint. Although the plaintiff experiences low-back pain, Dr. Yapor testified that the source of her pain is the S1 joint. Dr. Yapor stated that the plaintiff's condition is consistent with the history of the work-related injury that she reported to him. He also opined that the plaintiff is unable to work as a police officer. According to Dr. Yapor, the plaintiff tends to have "flare-ups" with prolonged sitting, standing, or

walking. He defined prolonged as 30 to 45 minutes. Dr. Yapor testified that the plaintiff could neither sit in a police car nor at a desk for any prolonged period of time. Dr. Yapor also stated that one of his concerns is that the weight of a gun belt exacerbates the plaintiff's pain. He was also concerned about the plaintiff working or driving a car while taking medication. On cross-examination, Dr. Yapor admitted that he saw no objective findings on any of the plaintiff's MRI scans or x-rays and that her EMG test was normal. Dr. Yapor testified that he was aware that the plaintiff had suffered prior injuries to her neck and low back, but is of a belief that those injuries had resolved and that her current condition is the result of the 2004 on-duty incident.

The Board's physician, Dr. Demorest, testified to the scope of his December 29, 2005, examination of the plaintiff and his findings on that date. According to Dr. Demorest, the muscles in the plaintiff's spinal column were in spasm, and she exhibited decreased forward flexion and lateral bending. Dr. Demorest diagnosed the plaintiff as suffering from myofascial pain syndrome, meaning a disfunction of the muscles, ligaments and tendons in her lower back. He testified that he found no evidence that the plaintiff was malingering or that she was exaggerating her pain. When questioned as to his opinion on the issue of the plaintiff's ability to work as a police officer, Dr. Demorest stated that he would not recommend that the plaintiff work in the field as a "full street police officer." He did believe that, if the Department

11

could accommodate her, the plaintiff could work in certain light-duty positions. He found that a 45-minute standing-sitting limitation would be common for an individual such as the plaintiff who suffers from low-back pain. Dr. Demorest also stated that, if the plaintiff returned to work, he would restrict her to duties where she could frequently change positions.

The plaintiff testified that she suffers from constant pain on the right side of her lower back, and shooting pains, going down her leg. She stated that she takes a variety of medications, including Neurontin, Valium, Vicodin and Ultran and uses Lidocaine patches 24 hours a day. In addition, she attends physical therapy sessions three times per week. The plaintiff admitted that she had injured her neck and back in a traffic accident while working on April 29, 2002, but stated that she fully recovered from that incident. The plaintiff also admitted that, since the incident which gave rise to her current condition, she has taken two trips by plane; one to Baltimore, Maryland, and one to Mexico. According to the plaintiff, she is able to drive, but only short distances.

The hearing was continued until April 26, 2006, when Lieutenant Thomas Schaedel, the commanding officer of the Department's medical section was called as a witness. Schaedel testified that, if an officer can qualify at the gun range and can ambulate independently, there are positions within the Department where an accommodation can be made for an officer returning to duty. Accommodation can also be made for an officer who must

12

change positions and who has a standing-sitting restriction. Schaedel testified that he had read Dr. Yapor's reports and found nothing that would prevent the plaintiff from returning to work on a limited-duty status. Schaedel admitted that the Department had never offered the plaintiff a limited-duty position, but stated that the plaintiff has never furnished the Department with a release from a doctor authorizing her to return to light-duty work.

The Board issued a written decision on May 26, 2006, denying the plaintiff's application for duty-disability benefits under the Code. The Board found that the plaintiff is not disabled, specifically stating that her "complaints of pain are subjective and do not prevent her full duty return to the CPD [Department]." The Board concluded that Dr. Yapor was not a credible witness, finding his testimony was "evasive and inconsistent." Seemingly as an aside, the Board also concluded that the plaintiff failed to establish a causal connection between her on-duty incident on July 25, 2004, and her complaints.

The plaintiff filed an action in the circuit court pursuant to Article III of the Code of Civil Procedure (Administrative Review Law) (735 ILCS 5/3-101 et seq. (West 2006)), seeking a judicial review of the Board's decision and an award of pre-judgment interest pursuant to section 2 of the Interest Act (815 ILCS 205/2 (West 2006)). The circuit court reversed the Board's decision and the Board appealed. However, this court dismissed the Board's appeal for want of jurisdiction, finding that the circuit court had

13

not as yet ruled on the issue of pre-judgment interest and that the provisions of Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)) had not been complied with. <u>Kouzoukas v. Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago</u>, No. 1-06-3320 (June 26, 2007). On remand, the circuit court awarded the plaintiff pre-judgment interest, and, thereafter, the Board filed the instant appeal.

Initially, the Board argues that the findings of fact which support its denial of the plaintiff's application for duty-disability benefits are not against the manifest weight of the evidence, and, as a consequence, the circuit court erred in reversing its decision in the matter. We disagree.

On judicial review, it is the court's function to ascertain whether the findings of fact and decision of the Board are against the manifest weight of the evidence. See <u>Abrahamson v. Illinois Department of Professional Regulation</u>, 153 Ill. 2d 76, 88, 606 N.E.2d 111 (1992). The decision of an administrative agency, such as the Board, is against the manifest weight of the evidence if an opposite conclusion is clearly evident. <u>Abrahamson</u>, 153 Ill. 2d at 88. Whether a reviewing court might reach the same conclusion as the Board is not the test of whether its determination on a question of fact is supported by the manifest weight of the evidence. Rather, the appropriate test is whether there is sufficient evidence in the record to support the Board's determination. <u>Abrahamson</u>, 153 Ill. 2d at 88. However, when an

14

No. 1-07-2623

administrative decision is against the manifest weight of the evidence, it is the court's duty to reverse it. <u>Zien v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago</u>, 236 Ill. App. 3d 499, 507, 603 N.E.2d 777 (1992).

In concluding that the plaintiff is not disabled within the meaning of section 5-115 of the Code (40 ILCS 5/5-115 (West 2006)), the Board found that her subjective complaints of pain "do not prevent her full duty return to the CPD." We have set forth in excruciating detail the facts relating to the plaintiff's medical treatment and the opinions of each of the physicians that have examined her to demonstrate that the Board's finding in this regard is against the manifest weight of the evidence.

Although none of the objective medical tests or scans performed on the plaintiff identified the source of her pain, each of the physicians that examined the plaintiff, with the exception of Dr. Spencer, rendered a diagnosis as to the source of her pain. Dr. Lewis, one of the plaintiff's treating physicians, and Dr. Demorest, the Board's doctor, each diagnosed the plaintiff as suffering from lumbar myofasciitis. Dr. Lewis wrote that the condition was "acute." Dr. Lewis also diagnosed lumbar radiculitis. When the plaintiff was examined by Drs. Lewis and Demorest, spasms of the muscles in her low back were noted. Dr. Demorest reported that the plaintiff had decreased forward flexion and lateral bending. Dr. Yapor, whom the Board found less than credible, testified that, although the plaintiff experiences low-

15

back pain, the source of the pain is her sacroiliac (S1) joint. It was only Dr. Spencer that found that the plaintiff "does not really have a back problem or an injury." His opinion in this regard, and upon which the Board appears to have rested its decision, is contained in an eight-line letter that the doctor wrote to the Department's medical section. According to the letter, Dr. Spencer based his opinion on the "pristine appearance" of the plaintiff's spine on her MRI scan. Although Dr. Demorest, the Board's own doctor, acknowledged that all of the plaintiff's tests were normal, he, nevertheless, believed that she is in pain. He explained that lumbar myofasciitis or myofascial pain syndrome is a disfunction of the muscles, ligaments and tendons of the low back. Further, Dr. Demorest found no evidence that the plaintiff was malingering or exaggerating her symptoms.

Contrary to the Board's finding, none of the physicians that treated or examined the plaintiff opined that she could return to "a full duty position" with the Department. As of June 13, 2005, Dr. Lewis found that the plaintiff was unable to work. Dr. Yapor stated that the plaintiff could not work as a police officer. Dr. Konowitz wrote in his report of March 23, 2006, that he was unable to authorize the plaintiff to return to duty. Dr. Demorest, the Board's own physician, testified on March 30, 2006, that he would not recommend that the plaintiff work in the field as a "full street police officer." Even Dr. Spencer, who released the plaintiff to return to work on August 8, 2005, imposed a temporary

16

20-pound bending and lifting restriction. Dr. Spencer's eight-line letter of August 8, 2005, notwithstanding, the Board's finding that the plaintiff can return to "a full duty position" with the Department is against the manifest weight of the evidence as an opposite conclusion is clearly apparent.

The Board also found that the plaintiff was not a credible witness in addressing her claim of pain. According to the Board, the plaintiff's failure to keep physical therapy appointments and her plane trips, "all raise questions as to her injury and the extent of her complaints of disabling pain."

The record establishes that the plaintiff has been under continuous medical care since her injury on July 25, 2004. She was treated at Resurrection for a low-back strain, two of her subsequent treating physicians diagnosed either an acute back strain or lumbar myofasciitis, two of her treating physicians identified the source of her pain as the S1 joint, four of her treating physicians prescribed pain medication to relieve the plaintiff's symptoms, and four physicians recommended or administered epidural injections. The Board's own physician, Dr. Demorest diagnosed myofascial pain syndrome and found no evidence that the plaintiff was malingering or exaggerating her pain. Not even Dr. Spencer opined that the plaintiff is not in pain. Yet, based upon the fact that the plaintiff missed several physical therapy appointments and took two plane trips and its reliance upon Dr. Spencer's letter stating that the plaintiff is not injured, the

No. 1-07-2623

Board found that the plaintiff's claims of pain were less than credible.

Great deference is accorded to the findings of an administrative agency on matters of witness credibility and the weight to be given to evidence. Lapp v. Village of Winnetka, 359 Ill. App. 3d 152, 167, 833 N.E.2d 983 (2005). However, in this case, the overwhelming weight of the medical evidence and the opinions of the Board's own physician lead us to conclude that any finding that the plaintiff does not suffer pain to an extent which prevents her from returning to a "full duty position" with the Department is against the manifest weight of the evidence.

Section 5-115 of the Code defines a disability as a "condition of physical or mental incapacity to perform any assigned duty or duties in the police service." 40 ILCS 5/5-115 (West 2004). An individual may be incapable of performing in a "full duty position" with the Department and yet not be disabled within the meaning of the Code if a position is made available to her which can be performed by a person with her physical disability. See Peterson v. Board of Trustees of the Firemen's Pension Fund of the City of Des Plaines, 54 Ill. 2d 260, 263-65, 296 N.E.2d 721 (1973); Thurow v. Police Pension Board of the Village of Fox Lake, 180 Ill. App. 3d 683, 690-91, 536 N.E.2d 155 (1989). Dr. Demorest testified that the plaintiff is capable to working in a light-duty capacity allowing her to change positions frequently. Schaedel testified that an accommodation can be made within the Department for an

18

officer who must change positions frequently and who has a standing-sitting restriction. However, Schaedel admitted that the Department has never offered the plaintiff a light-duty position within her restrictions.

As noted earlier, the evidence before the Board established that the plaintiff is physically incapable of performing in a "full duty position" with the Department. We believe, therefore, that she met her initial burden of proving that she is disabled within the meaning of section 5-115 the Code. Terrano v. Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago, 315 Ill. App. 3d 270, 276, 733 N.E.2d 905 (2000). In the absence of any evidence that the plaintiff has been ordered to return to duty and a light-duty position within her restriction has been offered to her, the mere existence of such a position will not support a finding that the plaintiff is not disabled. Terrano, 315 Ill. App. 3d at 276.

Finally, the Board found that the plaintiff failed to establish any causal connection between her complaints of pain and the on-duty incident of July 25, 2004. Its determination in this regard appears to be based on a finding that the plaintiff does not suffer from an injury or that, if she does, its source is gynecological or gastrointestinal in origin. Based on our analysis of the Board's findings as to the nature and extent of the plaintiff's injury, we also find that its determination as to causation is also against the manifest weight of the evidence.

19

No. 1-07-2623

For the reasons stated, we affirm the judgment of the circuit court which reversed the Board's decision to deny the plaintiff duty-disability benefits under the provisions of section 5-154 of the Code.

The Board also appeals from the circuit court's order awarding the plaintiff pre-judgment interest. The Board's argues both that the plaintiff waived any right to pre-judgment interest by failing to make a claim for interest before the Board and that the Board is not subject to the provisions of the Interest Act (815 ILCS 205/1 et seq. (West 2006)). We reject both arguments.

The powers of an administrative agency, such as the Board, are strictly confined to those granted in its enabling statute. City of Chicago v. Fair Employment Practices Comm'n, 65 Ill. 2d 108, 115, 357 N.E.2d 1154 (1976); Gilchrist v. Human Rights Comm'n, 312 Ill. App. 3d 597, 601, 728 N.E.2d 566 (2000). Pursuant to section 5-189 of the Code, the Board has the power "[t]o authorize the payment of any annuity, pension, or benefit granted under this Article or under any other Act relating to police pensions ***." 40 ILCS 5/5-189 (West 2006). However, we find nothing in section 5-189, or any other section of the Code, that grants the Board the power to award interest pursuant to section 2 of the Interest Act (815 ILCS 205/2 (West 2006)). For this reason, we reject the argument that the plaintiff waived her right to pre-judgment interest by failing to raise the issue before the Board. See Poindexter v. State of Illinois, 372 Ill. App. 3d 1021, 1026, 869

20

N.E.2d 139 (2007) (finding that claims not raised before an administrative agency were not waived where the claims were outside the agency's purview), aff'd, No. 104853 (April 3, 2008).

Finally, the Board invites us to revisit the issue of whether it is subject to the provisions of the Interest Act. In support of the argument that it is not subject to the Interest Act, the Board relies upon the Third District's opinion in Bassett v. Pekin Police Pension Board, 362 Ill. App. 3d 235, 839 N.E.2d 130 (2005).

In Fenton v. Board of Trustees of the City of Murphysboro, 203 Ill. App. 3d 714, 723, 561 N.E.2d 105 (1990), the court determined that a police pension as prescribed by statute is an instrument in writing subject to the provisions of section 2 of the Interest Act. The holding in Fenton, on this issue, has been followed in the First District in the cases of Barry v. Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago, 357 Ill. App. 3d 749, 772, 828 N.E.2d 1238 (2005); Martino v. Police Pension Board of the City of Des Plaines, 331 Ill. App. 3d 975, 983, 772 N.E.2d 289 (2002); and Barber v. Board of Trustees of the Village of South Barrington, 256 Ill. App. 3d 814, 819, 630 N.E.2d 446 (1993). We believe that the holding in Fenton and our earlier decision relying upon its holding are well reasoned, and, as a consequence, we decline to follow Bassett.

In summary, we affirm the judgment of the circuit court which reversed the Board's decision to deny the plaintiff duty-disability benefits and the circuit court's order awarding the plaintiff pre-

No. 1-07-2623

judgment interest.

    Affirmed.

    SOUTH and KARNEZIS, JJ., concur.